UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| EDISON ALBERTO CARVAJAL VASQUEZ, | ) ) ) |
| Petitioner, | ) ) |
| v. | ) Civil No. 3:18-cv-00137 ) |
| PAOLA ANDREA GAMBA ACEVEDO, | ) Judge Trauger ) |
| Respondent. | ) ) ) ) |

**RESPONDENT'S REPLY BRIEF**

Petitioner argues that TCG was a habitual resident of Colombia at the time of the alleged unlawful retention and that Petitioner did not consent to TCG living in the United States permanently. The Respondent denies these points.

**I. Habitual Residence**

**A. Applicable Legal Standards**

Because the Petitioner's arguments concerning habitual residence are inextricably intertwined with questions about the applicable legal standards, some elucidation of relevant legal precedent is necessary for this reply brief.

To understand "habitual residence" under the Hague Convention, the starting point is the text of the treaty. *Abbott v. Abbott*, 560 U.S. 1, 10 (2010) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text."). Unfortunately, the Hague Convention deliberately does not define "habitual residence." Elisa Pérez-Vera, Explanatory Report on the 1980 Hague Child Abduction Convention, ¶ 53 (1982). The Explanatory Report notes that the concept of

"habitual residence" was well-established at the Hague Conference and that it was regarded "as a question of pure fact, differing in that respect from domicile." *Id.* at ¶ 66. Decisions evaluating Hague Convention petitions have interpreted this omission to exhort courts to avoid overcomplicating the question of habitual residence with legal doctrine, which would make it as technical as the concept of domicile, and instead assess each case based on the particular factual circumstances presented. *See Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993); *Redmond v. Redmond*, 724 F.3d 729, 743-44 (7th Cir. 2013).

The Sixth Circuit addressed the question of habitual residence in *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir. 1993) ("*Friedrich I*"). There, the court articulated five principles to guide courts when determining the country of habitual residence:

> First, habitual residence should not be determined through the technical rules governing legal residence or common law domicile. Instead, courts should look closely at the facts and circumstances of each case. Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence. Third, this inquiry should focus exclusively on the child's past experience. Any future plans that the parents may have are irrelevant to our inquiry. Fourth, a person can have only one habitual residence. Finally, a child's habitual residence is not determined by the nationality of the child's primary care-giver. Only a change in geography and the passage of time may combine to establish a new habitual residence.

*Friedrich*, 983 F.2d at 1401 (internal citations omitted). The Sixth Circuit later acknowledged that *Friedrich* was, by its own admission, a "simple case" that might not provide much guidance for other situations. *Robert v. Tesson*, 507 F.3d 981, 992 (6th Cir. 2007). In *Robert*, adopted an approach developed in the Third Circuit and held that "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." 507 F.3d at 998 (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)).

By focusing the inquiry on the child's perspective rather than on the intentions of the parents, the Sixth Circuit initially took a different path than the approach taken by the Ninth and Second Circuits, which found that habitual residence could be determined by considering the last shared mutual intent of the parents regarding where the child would live. *See Gitter v. Gitter*, 396 F.3d 124, 132 (2d Cir. 2005); *Mozes v. Mozes*, 239 F.3d 1067, 1076 (9th Cir. 2001). The Sixth Circuit in *Robert*, however, took care to note that the child in that case was not a "very young" child, and the court expressed "no opinion on whether the habitual residence of a child who lacks cognizance of his or her surroundings should be determined by considering the subjective intentions of his or her parents." *Robert* 507 F.3d at 992 n.4. Subsequently, in *Simcox v. Simcox*, 511 F.3d 594, 602 n.2 (6th Cir. 2007), the Sixth Circuit upheld the acclimatization test, but again noted "[o]f course, this standard may not be appropriate in cases involving infants or other very young children."

In *Ahmed v. Ahmed*, 867 F.3d 682 (6th Cir. 2017), the Sixth Circuit finally addressed the question of how to determine the habitual residence of very young children. The children in *Ahmed* were 8 months old when they were removed. 867 F.3d at 685-86. The district court found that, as infants, the children were *unable* to acquire a "degree of settled purpose" anywhere simply by virtue of their age. *Id.* at 690. Therefore, the Sixth Circuit determined that it should the settled mutual intent of the parents in ascertaining a very young child's country of habitual residence. *See* 867 F.3d at 688.

When discussing "settled mutual intent," the Sixth Circuit clarified that it was referring to "the parents' last 'settled mutual intent' for where their child would live" as understood in *Gitter*. *Id.* at 687. The court expounded further upon the decision in *Gitter*. *Id.* at 690. In *Gitter*, the Second Circuit explained that, because children "normally lack the material and psychological

wherewithal to decide where they will reside . . . it is more useful to focus on the intent of the child's parents . . ." 396 F.3d at 132. The Second Circuit acknowledged that parents engaged in a Hague Convention case are, by definition, unlikely to agree about the child's habitual residence, and explained that it "then becomes the court's task to determine the intentions of the parents as of the last time that their intentions were shared." *Id.* at 133. Under this analysis, when the parents have mutually intended that the child acquire a new habitual residence and move the child to that new habitual residence, the child "has consequently acquired a new habitual residence." *Id.*

The Sixth Circuit in *Ahmed* indicated that it was not overturning *Simcox*, *Robert*, or *Friedrich I*, but rather addressing a gap in the law concerning the standard for very young children. *Id.* at 689. The starting point when identifying the state of habitual residence is still where the child has developed a degree of settled purpose. *Id.* Where the acclimatization standard becomes unworkable because the child is too young, "it is appropriate to consider the shared parental intent of the parties in cases involving especially young children who lack the cognizance to acclimate to any residence." *Id.* at 690. This is not a bright-line rule, and the determination of when to apply the shared mutual intent standard and when to apply the acclimatization standard "must largely be made by the lower courts, which are best positioned to discern the unique facts and circumstances of each case." *Id.*

B. Responses to Petitioner's Arguments

The Petitioner asserts that it is undisputed that TCG was a habitual resident of Colombia prior to his retention in the United States, and therefore TCG's habitual residence before his retention in the United States was in Colombia. (Doc. #20 at 5.) The Petitioner appears to argue that TCG's state of habitual residence was Colombia by the time he was removed by the Petitioner,

and that the Child's habitual residence remained in Colombia around six months later[1] at the time of the allegedly wrongful retention. These arguments are unavailing.

As a preliminary matter, it is not clear that TCG's habitual residence was settled in Colombia by the time of his removal. Whether a child's place of birth automatically becomes a child's state of habitual residence by operation of law is a question the Sixth Circuit may address when it rehears a recent Hague Convention case that considered this issue.[2]

In any case, Colombia was not TCG's state of habitual residence at the time of alleged retention. As the Petitioner has repeatedly emphasized, the point in time at which the relevant state of habitual residence is determined is not six months, or six weeks, or six days before the removal or retention, but "immediately before the removal or retention." (Doc. #20 at 4.) (emphasis in original); *see* Hague Convention, art 3(a). Focusing on TCG's alleged habitual residence six months before his alleged wrongful retention is the wrong time period.

*Robert*, which Petitioner cites, looks are a variety of factors to analyze habitual residence, though it is a removal case, not a retention case. 507 F.3d at 987. The Petitioner argues that the Court should not consider the intent of the parents because the child, who "was over two years old at the time he was retained in the United States," was not a very young child.[3] (Doc. #20 at 5, 8.)

---

[1] The Petitioner has not specifically identified when the allegedly wrongful retention took place. The earliest such date suggested is the date on which the child's visa expired, which would have taken place in February 2017.

[2] In *Taglieri v. Monsaky*, 876 F.3d 868, 872-74 (6th Cir. 2017) (*vacated for rehearing en banc*), the Sixth Circuit considered the habitual residence of a child who was born in Italy and removed to the U.S. when the child was eight weeks old. The majority concluded that, when a child was born in and has resided exclusively in only one country prior to removal, that country is the state of habitual residence prior to the removal. *Id.* at 876. In her dissent, Judge Karen Nelson Moore criticized this approach for introducing a formalistic, rigid, bright-line rule in contravention of *Friedrich I*'s admonishment otherwise. Judge Moore pointed out that, if the Sixth Circuit in *Ahmed* considered an eight-month old to be too young to acclimatize to place of habitual residence, then surely an eight-*week* old would likewise be too young to acclimatize to a habitual residence in Italy. Simply assuming habitual residence in the country of birth as a matter of law skips the deeply factual analysis laid out by *Friedrich I*, *Robert*, *Simcox*, and *Ahmed*. The Sixth Circuit has since agreed to vacate the decision and rehear the case *en banc*.

[3] The Respondent notes that the Petitioner's position that the child was old enough to form a sense of settled purpose while the child lived in the U.S. favors a finding that the child was acclimatized to the U.S. since the child was less able to form a sense of settled purpose when the child was an infant in Colombia and, as a one-year-old, was probably not sufficiently aware of his surroundings to form a sense of settled purpose while in Colombia.

The Respondent respectfully disagrees. A two year old is too young to acclimatize to a particular home psychologically and emotionally. The mutual intent test is the appropriate test for this case. Whether or not the child was too young to make the acclimatization standard workable is a question of fact for the Court to determine. *Ahmed*, 867 F.3d at 690. The starting point is to consider evidence of acclimatization of the child. *Id.* Factors that the Sixth Circuit has encouraged courts to consider include "academic activities," "social engagements," "sports programs," and "meaningful connections with the people and places." *Robert*, 507 F.3d at 996. Where a child is too young to effectively apply the acclimatization test, it is appropriate to consider the shared parental intent of the parties. *Ahmed*, 867 F.3d at 690.

There is no bright-line rule delineating the age when to apply the mutual intent test. *Ahmed*, 867 F.3d at 690. Indeed, the Sixth Circuit has long cautioned against applying formalistic rules for what is a very fact-intensive inquiry. *Id*; *see also Friedrich I*, 983 F.2d at 1401. The ages of the children in cases since *Robert* established the acclimatization test does not shed much light on this question either. The children in *Robert* were six years old. 507 F.3d at 984, 987.[4] The children in *Simcox* were four and seven years old. 511 F.3d at 598, 602. The child in *Jenkins v. Jenkins*, 569 F.3d 549, 552 (6th Cir. 2009), was three-years old at the time of the alleged wrongful retention.

Respondent submits that the acclimatization test is not fully workable as applied to the child in this case. While some elements of the acclimatization test, such as the meaningful connections the child has with people and places, can be applied in this case; other factors, such as the child's involvement in "academic activities," "social engagements," and "sports programs" are more difficult to evaluate, if not unworkable, in the case of a 2-year-old child who was too young to enroll in school, join clubs, or participate in sports programs. It is precisely where the

---

[4] The child in Friedrich I was two at the time of removal, but that case was decided before the adoption of the acclimatization test., 983 F.2d at 1398-99.

acclimatization test becomes unworkable that *Ahmed* fills a gap by allowing courts to consider relevant facts about the parents' last settled mutual intent in order to better reach an accurate assessment of the child's habitual residence. 867 F.3d at 689.

If the court determines that the mutual intent test cannot alone answer the habitual residence inquiry, the Respondent submits that the court should consider both the acclimatization of the child and the last settled mutual intent of the parents. The supposed circuit split on these tests is illusory. In substance, all circuits consider both parental intent and the child's acclimatization to be applicable where the acclimatization test is supposedly applied. *See Redmond v. Redmond*, 724 F,3d 729, 746 (7th Cir. 2013) ("all circuits – ours included – consider *both* parental intent *and* the child's acclimatization, differing only in their emphasis."); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 297 (3d Cir. 2006) (describing the disagreement among the circuits as a difference of opinion about how to "weigh [parental intent and the child's acclimatization] against each other if they conflict[. . .]"). In *Feder*, which introduced the acclimatization analysis the Sixth Circuit subsequently adopted in *Robert*, the Third Circuit observed that the inquiry into a child's habitual residence "must focus on the child and consists of an analysis of the child's circumstances in that place *and the parents' present, shared intentions regarding their child's presence there*." 63 F.3d at 224 (emphasis added). After all, in *Feder*, the Third Circuit reversed the district court's habitual residence determination because the district court had given insufficient attention to the intentions of one of the parents. *See id.* Likewise, the Eighth Circuit noted that "[t]he 'settled purpose' of a family's move to a new country is a central element of the habitual residence inquiry . . . " which ". . . must be from the child's perspective, *although parental intent is also taken into account*." *Barzily v. Barzily*, 600 F.3d 912, 918 (8th Cir. 2010) (emphasis added). The Ninth

Circuit in *Mozes* similarly acknowledged the role of acclimatization in balance with parental intentions. 239 F.3d at 1078.

Such flexibility observed in the actual practice of the circuits reflect an awareness of the issue at the heart of a Hague Convention determination. At the end of the day, what is at stake is the stable development of a child. In lieu of a overly doctrinal and rigid test, the two tests can compliment each other. *Cf. Ahmed*, 867 F.3d at 690.

If the Court considers last mutual settled intent, the Petitioner next argues that the Respondent has failed to prove a shared intent for TCG to live in the U.S. (Doc. #20 at 7-9.) Petitioner's arguments are not supported by the facts.

First, when applying the mutual intent test, the burden is not on the Respondent to show a last settled mutual intent for TCG to live in the U.S.; the burden is on the Petitioner to show a last settled mutual intent for TCG to live in Colombia. 42 U.S.C. § 11603(3)(1)(A) (Petitioner's burden to prove his prima facie case by a preponderance of evidence); *Ahmed* 867 F.3d at 690 (affirming district court's finding that the petitioner failed to carry his burden under the shared parental intent standard of showing a settled mutual intent for the child to live in the United Kingdom).

Petitioner also characterizes of the parties' plans to bring the child to the U.S. as "mere discussions," the Respondent highlights that actions were taken in response to these discussions. Mere discussions do not lead to the Petitioner taking the Respondent to the airport to fly to Mexico, Respondent crossing the U.S.-Mexican border, Petitioner bringing the child to the U.S. and leaving with the Respondent's sister the next day, Petitioner wiring money to help Respondent's immigration case. This is evidence "decision"—the parties' last settled mutual intentions—well beyond "mere discussions."

Moreover, the case the Petitioner cites to support the position that a mere "discussion between two parents is insufficient to establish intent of both parents to remain in a different country," *Holmes v. Holmes*, 887 F. Supp. 2d 755, 759 (E.D. Mich. 2012), does not stand for the proposition the Petitioner states. The petitioner in that case, a citizen of Ireland, alleged that the respondent, a U.S. citizen, wrongfully removed the child from Ireland to the United States. *See id.* at 757. The court in *Holmes* concluded that the petitioner failed to show last settled mutual intent for the family to live in Ireland because of an abundance of evidence showing that the parties originally mutually intended to stay in Ireland only temporarily, not because of mere discussion about moving back to the U.S. 887 F. Supp. 2d at 758-59.

Petitioner further argument that his subsequent filing of a complaint and petition under the Hague Convention "clearly indicate that he never intended for TCG to establish a new habitual residence in the United States" is similarly unavailing. A present disagreement about habitual residence is not evidence that there was never any mutual intent before the disagreement. The mutual intent test, in fact, anticipates that adversaries in hotly-contested litigation will probably disagree with each other and looks the last shared intent. *Gitter*, 396 F.3d at 133. It is the Petitioner's burden to show that the last mutually shared intention between the parents was for the child to live in Colombia. 42 U.S.C. § 11603(3)(1)(A); *Ahmed*, 867 F.3d at 690; *Holmes*, 887 F. Supp. 2d at 758. However, the record is already replete with evidence showing that the last settled mutual intent of the parties was for TCG to live in the United States.

Finally, the Petitioner maintains that he brought TCG to the United States for vacation, and not as part of a more permanent relocation. (Doc. #20 at 9.) Petitioner's actions contradict his testimony. From bringing TCG to the U.S. and dropping him off, to helping TCG's mother relocate permanently to the U.S., to leaving Petitioner's own clothes in the U.S. in January 2017 and giving

Page **9** of **14**

Case 3:18-cv-00137    Document 33    Filed 03/19/18    Page 9 of 14 PageID #: 786

away TCG and Respondent's clothes in Colombia, the evidence shows that Petitioner intended TCG to live in the U.S., not just vacation here.

"The purpose of the Hague Convention is to 'protect children internationally from the harmful effects of their wrongful removal or retention . . . .'" *Robert*, 507 F.3d at 988 (quoting the Hague Convention). To that end, "the Convention should be read to prevent a circumstance where 'the child is taken out of the family and social environment in which its life has developed." *Id*. (quoting the official commentary). The undisputed testimony from the hearings is that the family and social environment in which the child's life has developed has been with the mother and that the child would acclimatize to where she is quickly. The child grew up speaking English primarily. The principles of the Hague Convention, the acclimatization test, and the mutual intent test all yield the same result: TCG's habitual residence as of February 2017 was the U.S.

### C. Consent

The Petitioner presents three arguments for finding that he did not consent to the retention of the child in the United States: (1) that the parties never made any firm plans for the child to move to the U.S.; (2) that his petition under the Hague Convention is evidence that he did not consent to the child's retention in the United States; and (3) that, even if he gave consent for the child to be retained in the U.S., that consent was conditioned on his ability to marry the Respondent and the Respondent's rejection of his marriage proposal annulled his consent. *Id.* at 12-13.

The Petitioner's first two arguments mirror arguments under habitual residence that there was "mere discussion" about moving and that the petition shows that he did not consent under habitual residence. For the reasons mentioned previously, the Respondent contests the Petitioner's characterization of the parties as lacking firm plans and that subsequent disagreement about resident somehow disproves prior consent. The Petitioner's involvement in helping the

Respondent enter the U.S. and the fact that the Petitioner himself brought the child to the U.S. show that the parties long ago moved beyond the planning stage and into consent. Further, Petitioner argument that his Hague Convention petition shows that he did not consent to retention misses one of the features of consent that distinguishes it from acquiescence: "[t]he consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005.) Because consent is about the Petitioner's intent *before* the allegedly wrongful retention, his subsequent actions *after* the parties fell into disagreement are not relevant to ascertaining his prior intent.

The Petitioner last argues that, even if he had consented to TCG relocating to the U.S., that consent was conditioned upon his ability to marry the Respondent and join TCG and the Respondent in the U.S. (Doc. #20 at 12-13.) In support of this argument, the Petitioner cites *Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012) for the proposition that consent can be conditioned on certain factual predicates, and the failure of those conditions to be realized can be grounds for annulling consent. The facts here are not analogous to *Mota*, making Petitioner's reliance upon *Mota* unhelpful. Some exposition of the facts of that case is due here.

In *Mota*, the parties and the child were all citizens of Mexico. 692 F.3d at 109. When the child was six-months old, the father entered the U.S. illegally, found a job, and began supporting the family in Mexico. *Id.* at 110. The mother assumed sole responsibility for the child's care. *Id.* Three years later, the parties decided to reunite the family in the U.S. *Id.* They planned for the mother, using funds provided by the father, to hire smugglers to bring the child across the border. 692 F.3d at 110. After the child entered the U.S., the mother would follow. *Id.* The smugglers successfully brought the child across the border and brought her to live with the father. *Id.*

However, the mother was repeatedly caught at the border and returned to Mexico. *Id.* Upon one entry, she was arrested and prosecuted for using false identification, serving a 75-day sentence then being deported to Mexico. 692 F.3d at 110. At this point, the mother would not be able to join the child in the U.S. and any attempts to do so would expose her to the greater risk. *Id.* It is in this context that the Second Circuit found that the mother's "consent to her daughter's relocation was conditioned upon her own *ability* to join father and daughter in New York" and that "[t]he failure of this condition annulled [the mother's] consent." *Mota*, 692 F.3d at 117 (emphasis added).

These facts show that the conditionality described in *Mota* cannot refer to the ordinary expectation that couples have that they will be able to live happily ever after together as a family. If that were the case, every Hague Convention case premised on a relationship turned sour — which is to say practically every Hague Convention case — would be exempt from the consent defense. What frustrated the mother's intent in *Mota* and ultimately annulled her consent was the fact that she was legally and physically *unable* to actualize the original plan. The only reason she agreed to surrender her child to smugglers was that she planned to follow immediately afterwards. 692 F.3d at 110. In contrast, here, Petitioner consented to TCG living here permanently, even when Petitioner's plan was to live in Colombia and visit TCG every six months. There were no conditions, nor was Petitioner unable to come. The Respondent's sister has always allowed the Petitioner to visit TCG in her house. (Doc. #31 at 65.) Deterioration of a relationship is insufficient to annul consent in Hague Convention claims, then the consent defense disappears.

## II. Conclusion and Prayer for Relief

There are many issues to be resolved between the parties: the custody rights to the child, visitation rights, questions regarding the best interest of the child. Those issues are not before the Court because this is not a family law case. What is before the Court is a Hague Convention

petition, and the Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The question before the Court is simply whether this is a case of child abduction, of wrongful removal or retention. The facts laid out at trial show that this is not an international child abduction case. For all the reasons articulated above, the Respondent prays that the Court deny the Petitioner's claim under the Hague Convention.

Respectfully submitted this 19th day of March, 2018.

>  /s/ Joel Sanderson
> Joel Sanderson, Attorney for Respondent
> 5252 Hickory Hollow Parkway, Suite 270A
> Antioch, TN 37013
> (615) 307-6472 (O)
> Joel@mira.legal
> TN BPR # 33521

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2018 I electronically filed the foregoing document with the United States Federal District Court for the Middle District of Tennessee by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

ALEX S. FISHER
FROST BROWN TODD LLC
The Pinnacle at Symphony Place
150 3rd Ave South, Suite 1900
Nashville, TN 37201
afisher@fbtlaw.com
(615) 251-5594

                                              /s/ Joel Sanderson
                                              Joel Sanderson, Attorney for Respondent
                                              5252 Hickory Hollow Parkway, Suite 270A
                                              Antioch, TN 37013
                                              (615) 307-6472 (O)
                                              Joel@mira.legal
                                              TN BPR # 33521