```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF TENNESSEE
 2                   NASHVILLE DIVISION

 3   EDISON ALBERTO CARVAJA VASQUEZ,   )
                                       )
 4            Plaintiff,               )
                                       )
 5   vs                               )   Case No. 3:18-cv-00137
                                       )
 6   PAOLA ANDREA GAMBA ACEVEDO,       )
                                       )
 7            Defendant.               )
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 8
                      BEFORE THE HONORABLE
 9
            ALETA A. TRAUGER, U.S. DISTRICT COURT
10
                   TRANSCRIPT OF PROCEEDINGS
11
                  (Through Spanish interpreters)
12
                       March 20, 2018
13
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
14
     APPEARANCES:
15
     For the Petitioner:    Ms. Alexandria Scarbrough Fisher
16                          Ms. Katharine Fischman
                            Frost Brown Todd LLC
17                          150 3rd Avenue South, Suite 1900
                            Nashville, TN  37201
18
     For the Respondent:    Mr. Joel Hugh Sanderson
19                          Mr. Chen Song
                            Monarch Immigration Rights Advocates
20                          5252 Hickory Hollow Parkway
                            Antioch, TN  37013
21
     Interpreters:          Judith Kristy
22                          Heather Hayes

23   PREPARED BY:
                       PATRICIA A. JENNINGS, RMR, CRR
24                        Official Court Reporter
                          801 Broadway, Room A837
25                        Nashville, TN 37203
                      patty_jennings@tnmd.uscourts.gov
```

1                        INDEX

2
   WITNESSES:                                          PAGE
3
   Ana Maria Vasquez
4
         Direct Examination by Ms. Fisher                7
5        Cross-Examination by Mr. Sanderson             12

6  DIANA EUGENIA VASQUEZ RUA

7        Direct Examination by Ms. Fisher               25
         Cross-Examination by Mr. Sanderson             32
8        Redirect Examination by Ms. Fisher             39

9  EDISON ALBERTO CARVAJA VASQUEZ

10       Direct Examination by Ms. Fisher               42
         Cross-Examination by Mr. Sanderson             52
11       Redirect Examination by Ms. Fisher             65

12 LUZ ELENA VILLEGAS SANCHEZ

13       Direct Examination by Ms. Fisher               68
         Cross-Examination by Mr. Sanderson             72
14       Redirect Examination by Ms. Fisher             80
         Recross-Examination by Mr. Sanderson           83
15
16                       EXHIBITS

17 PETITIONER'S:                                        PAGE

18 No. 13   Affidavit of Diana Vasquez Rua             28
   No. 14   Photos of Mr. Carvaja and son              66
19 No. 15   Affidavit of Luz Elena Villegas Sanchez    71

20 RESPONDENT'S

21 No. 11   Emails between Mr. Carvaja and Luz Elena
            Villegas Sanchez                            82
22

23

24

25

1    The above-styled cause came on to be heard on

2 March 20, 2018, at 1:45 p.m., before the Honorable Aleta A.

3 Trauger, District Judge, when the following proceedings were

4 had, to-wit:

5    THE COURT:  Let's swear the interpreters.

6    (Interpreters sworn.)

7    THE COURT:  Okay.  We are here on the third

8 chapter of a Hague convention case, Edison Alberto Carvaja

9 Vasquez versus Paola Andrea Gamba Acevedo.  We have for the

10 petitioner Alex Fisher and Katharine Fischman.  And sitting

11 with them is their paralegal.  For the respondent, we have

12 Joel Sanderson and -- is Mr. Song here today?

13    MR. SANDERSON:  Yes, Your Honor.  He's going to be

14 coming back in between witnesses.

15    THE COURT:  Okay.  All right.

16    MR. SANDERSON:  He had to step out.

17    THE COURT:  And the petitioner is in Colombia, and

18 the respondent is here with the child at issue.  And we have

19 an interpreter who is functioning just to communicate with

20 the respondent.  We didn't need to swear her.

21    So I understand that we have two witnesses for the

22 petitioner, and we have an additional witness for the

23 respondent; is that correct?

24    MR. SANDERSON:  Yes, Your Honor.  We expect to put

25 on both the respondent and her sister as rebuttal witnesses.

```
 1              THE COURT:  Okay.  So you want to hear the other
 2    testimony -- we're going to go to the other testimony first?
 3              MR. SANDERSON:  Yes, Your Honor.
 4              THE COURT:  Okay.  Very good.  So we have got -- I
 5    can't really see that very well, but do we have someone in
 6    Colombia, or are we going to be just --
 7              COURT DEPUTY:  We won't be seeing --
 8              THE COURT:  We won't be seeing anything.  We'll
 9    just be hearing.  Okay.
10              MR. SANDERSON:  Your Honor, the interpreter just
11    told me that these headphones aren't working.
12              THE COURT:  Excuse me?
13              MR. SANDERSON:  They just told me that these
14    headphones are not working.
15              MS. FISHER:  Your Honor, to clarify, we have three
16    rebuttal witnesses, two new witnesses, and then Mr. Carvaja
17    will testify.
18              THE COURT:  Okay.
19              MS. FISHMAN:  And they're all --
20              INTERPRETER HAYES:  The interpreter cannot hear.
21    Sorry.
22              COURT DEPUTY:  Speak into that microphone right
23    there.
24              MS. FISHER:  We have three rebuttal witnesses
25    today, two new witnesses, and then Mr. Carvaja will testify
```

as a rebuttal witness.  All three have verified that they're
on the telephone conference currently and can hear what the
interpreter is saying.

THE COURT:  Okay.  And we haven't really -- nobody
has called for the rule in this case, so I guess it's all
right for everybody to be on the phone at the same time.

MR. SANDERSON:  Yes.

THE COURT:  So do we have working --

MR. SANDERSON:  No.

THE COURT:  We do not.

INTERPRETER HAYES:  Sorry, Judge.  I'm not sure
what's going on.

MR. SANDERSON:  Got a lot of static coming out.

INTERPRETER HAYES:  Your Honor --

THE COURT:  Yes?

INTERPRETER HAYES:  -- I tested it out before we
started, and I could hear myself doing "Testing, testing,"
and now I don't have a signal.  Sorry.

THE COURT:  Okay.  What do we need to do?

INTERPRETER HAYES:  Judith is going to go get the
court's equipment.

THE COURT:  Okay.

INTERPRETER HAYES:  I'll try with that.
Apparently, we can hear through this one.

THE COURT:  Okay.  Do we have something that's

```
1    working?  So we want to go forward?
2                MR. SANDERSON:  Yes, Your Honor, it's working
3    right now.
4                THE COURT:  Okay.  Let's go forward then.  Let me
5    ask one quick question.  I'm a little confused.  In your new
6    briefs, you both -- or at least I noticed that the respondent
7    seemed to concede that the child's visa was for six months,
8    and yet Plaintiff's Exhibit 5, the legal written
9    authorization for minor to leave the country, is from August
10   to December of 2016.  And I don't believe that the passports
11   show any kind of a six-month visa.  So I'm wondering, where
12   does the six months come from?  What documentation is there?
13               MR. SANDERSON:  Your Honor, I believe that it's
14   based on the entry stamp that is in the passport.  I have to
15   check.
16               THE COURT:  Okay.
17               MR. SANDERSON:  But I believe that you -- you can
18   get permitted to enter for any amount of time, depending on
19   how much Customs and Border Protection decides how much they
20   like you, but six months is the longest that they can give
21   you as an initial stay.
22               THE COURT:  And you think it's stamped in the
23   passport?
24               MR. SANDERSON:  I do think so.
25               THE COURT:  I don't remember seeing that.  I think
```

1    we'll retrieve the passports that are locked up, I think,

2    aren't they, somewhere?  Didn't we lock them up?

3              COURT DEPUTY:  Yes.  Yes, in your office.

4              THE COURT:  Yes.

5              COURT DEPUTY:  You want me to go get them?

6              THE COURT:  Yes.  Okay.  Let's swear the witness,

7    and then you can get it.  That's just a dangling question

8    that's bothering me.  Okay.  So, Ms. Fisher, you want to call

9    your first witness?

10             MS. FISHER:  Yes, Your Honor.  I'd like to call

11   Ana Maria Vasquez.

12             THE COURT:  Ana Maria Vasquez.  And let's swear

13   her.

14             COURT DEPUTY:  Is she on the --

15             THE COURT:  Can we -- Ms. Vasquez, are you on the

16   phone?

17             THE WITNESS:  Here I am.

18             COURT DEPUTY:  Raise your right hand.

19                       ANA MARIA VASQUEZ,

20   called as a witness, having been duly sworn, was examined and

21   testified as follows:

22             THE WITNESS:  Yes, I swear before God.

23                       DIRECT EXAMINATION

24   BY MS. FISHER:

25   Q.   Ms. Vasquez, please state and spell your name, for the

1  court reporter.

2  A.   Ana Maria Vasquez.

3  Q.   Will you please repeat your name for the interpreter?

4  A.   Sierra.  Ana Maria Vasquez Sierra.

5  Q.   Ms. Vasquez, how do you know Edison Carvaja?

6  A.   I've known him since he was three years old.

7        INTERPRETER KRISTY:  The interpreter wishes to

8  report that the sound is not good.

9        THE COURT:  I can hear it's not good.  It's kind

10  of foggy.

11        INTERPRETER KRISTY:  Yes.

12  BY MS. FISHER:

13  Q.   Are you related to Edison Carvaja?

14  A.   Yes, we're cousins, first cousins.

15  Q.   And, Ms. Vasquez, where do you live?

16  A.   In Belga, Antioquia, in Colombia.

17  Q.   Thank you.  And, Ms. Vasquez, please speak slowly and

18  clearly for the interpreter, so they can hear you more

19  clearly.

20  A.   Belga, Antioquia, Colombia.

21  Q.   Ms. Vasquez, please describe to the best of your

22  knowledge Mr. Carvaja's and Ms. Gamba's living arrangements

23  in Colombia from the time of Thiago's birth, until Thiago

24  departed from Colombia in 2016.

25  A.   It was my understanding that they were together as

```
 1  fiances, and that he was paying for an apartment in Medellin
 2  where he could live together with Thiago and Paola.
 3  Q.   Ms. Vasquez, to the best of your knowledge, how often
 4  did Mr. Carvaja see his son, Thiago?
 5  A.   Well, yes, he would visit every day after he came home
 6  from work, and then on the weekends from Thursday through
 7  Sunday, he spent with Paola and -- with Thiago and Paola.
 8  Q.   And to the best of your knowledge, please describe your
 9  family's involvement in Thiago's life in Colombia.
10           INTERPRETER HAYES:  Whose involvement?
11           THE COURT:  Thiago is the son.
12           MS. FISHER:  Ms. Vasquez's family's involvement.
13           INTERPRETER HAYES:  Thank you.
14           MS. FISHER:  Stop just one moment, so the
15  interpreter can translate, and then you can continue.
16           THE WITNESS:  Well, we'd go to the family's
17  country home.  We always were present in his -- in Thiago's
18  life.  We went to the baby shower.  We went to his birthday
19  party at his very first birthday.  His sister also made a
20  party for him.
21  BY MS. FISHER:
22  Q.   Please continue.
23  A.   During that time, we always were accompanying them,
24  Edison and Paola and the baby, and they used to go to the
25  mall where I worked.  So I used to see them fairly frequently
```

1  because the mall where I worked is only five minutes from the

2  house where they lived.

3  Q.    Ms. Vasquez, have you --

4  A.    And there was always -- there was always good will and

5  good treatment toward Paola and Thiago.  And so there was

6  always lots of interaction as well between Thiago and his

7  cousins, that would be the children of Edison's brother --

8  siblings and -- yes, that's all.

9  Q.    Thank you.  Ms. Vasquez, have you ever witnessed

10 Mr. Carvaja physically harm or abuse Thiago or Ms. Gamba?

11 A.    No.  I certainly can attest to him giving good treatment

12 to Thiago and to Paola.

13 Q.    Are you aware of any --

14 A.    Because I had the opportunity to spend time with them in

15 several occasions.  And --

16          INTERPRETER HAYES:  Could counsel inquire --

17          THE WITNESS:  And he, she, it always showed -- he

18 always was a good and loving father.

19 BY MS. FISHER:

20 Q.    Are you aware of any occasion upon which Mr. Carvaja

21 abused Thiago or Ms. Gamba?

22 A.    No, never.  He was always very attentive and satisfied

23 his wishes.

24 Q.    Is Mr. Carvaja trustworthy, in your opinion?

25 A.    Yes, he's very trustworthy.  He's a hard worker.  He's

1  affectionate.  He's always been good with his family.

2  Q.    Based on your knowledge, were you aware of Mr. Carvaja

3  intending to move to the United States permanently?

4  A.    No.  He always used to travel with the family.  He used

5  to like to go out driving or walking with the child, and he

6  spent his vacations with them in December because he always

7  has his vacations in December.

8              INTERPRETER KRISTY:  I couldn't understand.

9              MR. FISHER:  Can you please repeat the last

10  sentence for the interpreter?

11              THE WITNESS:  Otherwise he would have been here in

12  Medellin.

13  BY MS. FISHER:

14  Q.    Do you know the purpose of Mr. Carvaja's trip to the

15  United States in December 2016?

16  A.    Could you please ask the question again?

17  Q.    Do you know the reason for Mr. Carvaja's trip to the

18  United States in December 2016?

19  A.    It was to go and get together with his family, with

20  Thiago and Paola, and to bring Thiago back to Colombia.

21  Q.    Do you know if Mr. Carvaja gave consent to Ms. Gamba to

22  keep Thiago in the United States?

23  A.    No.  He only gave permission for Paola and Thiago to

24  spend time with her sister.  He never gave permission for him

25  to stay.  That's why he's going through this process of

1  trying to recover his child, get his child back.

2  Q.  Ms. Vasquez, is there anything else you think the Court

3  needs to know today about this situation?

4        INTERPRETER HAYES:  About the situation -- what

5  was the end of the question?  I'm sorry.

6        THE COURT:  I don't think we'll have an open-ended

7  question.  Just ask a specific question, or if you don't have

8  anymore, we'll go to cross.

9        MS. FISHER:  Okay.  Yes, Your Honor.

10        THE COURT:  She doesn't know what's relevant.

11        MS. FISHER:  Yes.  That's all.  Those are all my

12  questions for now.  The other attorney, who represents

13  Ms. Gamba, has some questions for you at this time.

14                    CROSS-EXAMINATION

15  BY MR. SANDERSON:

16  Q.  Hi, Ms. Vasquez.  This is attorney Joel Sanderson.  I'm

17  the attorney for Ms. Gamba.

18  A.  Please to meet you.

19  Q.  In 2016, how far away did you live from Ms. Gamba?

20  A.  Could you repeat it for me, please?

21  Q.  Yes.  In 2016, how far away did you live from

22  Ms. Gamba's house?

23  A.  I always lived in the same municipality as them.

24  Q.  And how long would it take you --

25        INTERPRETER KRISTY:  The interpreter didn't

1  understand.

2          MR. SANDERSON:  Can you repeat that second part?

3          THE WITNESS:  I always lived in the same

4  municipality as them, but because the place where I worked

5  was near their house, I would visit them often.

6  BY MR. SANDERSON:

7  Q.    And how many minutes would it take for you to get from

8  your house to Ms. Gamba's house?

9  A.    Five minutes in car, by car.

10  Q.    And how many times per week did you see Ms. Gamba?

11  A.    Once a week.

12  Q.    And where would you see them?

13  A.    At the mall where I worked.

14  Q.    So they --

15  A.    And sometimes --

16  Q.    You can go ahead.

17  A.    And sometimes I used to see Thiago and Edison at

18  Edison's mother's house --

19  Q.    So did --

20  A.    -- when I was going to my aunt's house.

21  Q.    Is your testimony that Ms. Gamba and Thiago visited you

22  in the mall every week?

23  A.    Yes, when they would go there to buy some ice-cream for

24  the little boy or to play with the toys there or sometimes

25  when they went to the marketplace.

```
1   Q.   And what kind of store did you work in?
2   A.   It was an ice-cream store.  It was called Ketsy
3   (phonetic).
4   Q.   How many times did you go over to Ms. Gamba's house?
5   A.   I went once.  I went there with one of his cousins, a
6   female cousin.
7   Q.   And how did --
8   A.   But many times when I would go to my aunt's house, I
9   would find Thiago there with his daddy and with my aunt.
10  Q.   So Thiago was often at Mr. Carvaja's mother's house?
11  A.   Yes, ma'am.
12  Q.   And how did you know that Mr. Carvaja was paying for
13  Ms. Gamba's apartment?
14  A.   Because I always talked about him when they would visit
15  me at my workplace, and I knew that they had plans to be
16  together as a couple.  In fact, he used to pay for the
17  groceries for the house, and he also furnished the apartment.
18  Q.   And do you know if he paid for rent for Ms. Gamba?
19  A.   Yes, of course.  The house belonged to her parents, and
20  she lived in the first floor, and he paid the rent.
21  Q.   So he paid her parents?
22  A.   Yes.
23  Q.   You stated that Mr. Carvaja gave Paola permission to
24  visit her sister; is that correct?
25  A.   No.
```

Q.   So how did Mr. Carvaja help Ms. Gamba come to the United
States?

A.   He never helped her.

Q.   So what was the plan for Thiago after he was dropped at
her sister's house?

A.   To go back for him to bring him back to Colombia,
because that was their plan.

Q.   And where was Paola?

A.   The plan that they had.  Where was Paola?

Q.   Yes.

A.   When?

Q.   When Mr. Carvaja was bringing Thiago to the United
States.

A.   I have no idea about that.  I don't know about that.

Q.   So --

A.   I know that Edison was with the little boy taking care
of him.

Q.   And was the little boy, Thiago, living with Mr. Carvaja?

A.   Half of the time with him and half of the time with
Paola's -- half of the time with his mother and half of the
time with Paola's mother.

          INTERPRETER KRISTY:  Wait, the interpreter needs
to correct the record.

          THE WITNESS:  Half of the time with him and half
of the time with Paola's mother.

BY MR. SANDERSON:

Q.   Can you repeat the end of your statement?

A.   But Edison would take his son to the day care before he went to work.

Q.   So did Thiago sleep at Mr. Carvaja's house half of the week?

A.   Yes.

Q.   You said that you saw Ms. Gamba every week with Thiago, but then from the end of July to the end of August she was not in Colombia.  Did you worry about where she was?

          INTERPRETER HAYES:  Could counsel repeat the question?  The interpreter is very sorry.  It's very hard to keep track.

BY MR. SANDERSON:

Q.   So you stated that you saw Ms. Gamba every week at the mall, but from the end of July until the end of August, Ms. Gamba was not in Colombia.  Did you worry that you hadn't seen her?

A.   I'm talking about before that.  I never said anything about August and July.

Q.   So what time period are you talking about when you say that you saw Ms. Gamba and Thiago every week?

A.   Until May of 2016.

Q.   And starting when?

A.   From 2015, when I first started working at the ice-cream

1    store.

2    Q.    And why did you stop seeing them in 2016, in the month

3    of May?

4    A.    Because I quit my job.

5    Q.    And from May 2016 until August 2016, did you still see

6    Ms. Gamba and Thiago every week?

7    A.    No.

8    Q.    And how often did you see them during that period of

9    time?

10    A.    No, I only saw my cousin and my aunt when I went to

11    visit them.  And sometimes I saw the little boy under their

12    care.

13    Q.    And who was taking care of Thiago?  Mr. Carvaja's

14    mother?

15    A.    No, it was always Edison, but my aunt was always at the

16    house.  And so they took care of him together.

17    Q.    Did you know that Ms. Gamba had come to the United

18    States at all in 2016?

19    A.    I had knowledge of that fact.

20    Q.    And how did you learn of that fact?

21    A.    When Edison was leaving in December, he told me that he

22    was going to go there to get together with them.

23    Q.    And was he --

24              INTERPRETER KRISTY:  Ask her to repeat, please.

25              MR. SANDERSON:  Can you repeat that second part?

 1          THE WITNESS:  Because Edison said that he was
 2  going to get together with them there, and so that they could
 3  all come back together to Colombia to live in an apartment
 4  that he was paying for.
 5  BY MR. SANDERSON:
 6  Q.    And had he already started paying for this apartment?
 7  A.    Yes.  I accompanied him when we went for the first
 8  viewing of the apartment.
 9  Q.    And when was that?  Sorry.  Ms. Vasquez, can you repeat
10  that one more time?
11  A.    It was in 2015.  He had a project that he was going to
12  get to work out together with Paola.
13  Q.    And what was that project?
14  A.    The project was to marry here in Colombia and then live
15  here in Colombia in the apartment he was buying.
16  Q.    So Mr. Carvaja and Ms. Gamba made the plan to get
17  married back in 2015?
18  A.    No, it wasn't in 2015.  It was 2015 when he started
19  paying for the monthly amounts for the apartment.
20  Q.    And is that apartment that he was paying for separate
21  from where Ms. Gamba and Thiago were living with her parents?
22  A.    Yes.
23  Q.    So he had a separate apartment, but Ms. Gamba and Thiago
24  never moved into it?
25  A.    No, because he was just starting to pay for it.  This

1  was a project for the future.

2  Q.   Was anybody living in that apartment?

3  A.   No, it was under -- it was just being built.

4  Q.   And when did Mr. Carvaja and Ms. Gamba decide to marry?

5  A.   In December of 2015.  That's when the engagement took

6  place.

7  Q.   Can you repeat the date?

8          INTERPRETER KRISTY:  2016.

9          THE WITNESS:  In December of 2016.

10  BY MR. SANDERSON:

11  Q.   And did you speak with Mr. Carvaja when he got back in

12  January of 2017?

13  A.   Yes.  He was very happy because Paola had told him yes.

14  Q.   And what was Paola's plan at that point for where she

15  was going to live?

16  A.   He always said that they had decided that they would

17  stay here to live in Medellin when the apartment was

18  finished.

19  Q.   And when was the apartment going to be finished?

20  A.   It was supposed to finish the end of this year.

21  Q.   So it was supposed to finish the end of 2018?  Sorry,

22  Ms. Vasquez.  Can you repeat that whole answer?

23  A.   It was a new project, so the apartment -- the date was

24  extended because of regulations.  The construction company

25  had to extend the period of the contract.

1   Q.   And Ms. Gamba would not move in with Mr. Carvaja then
2   until that apartment was completed; right?
3   A.   No, they were going to get married, and they were going
4   to live together independent of whether the apartment was
5   finished or not.
6   Q.   What's your current relationship with Mr. Carvaja?
7   A.   We're cousins.
8   Q.   And how often --
9           THE COURT:  I'm sorry.  I didn't hear the answer.
10          INTERPRETER KRISTY:  We're cousins.
11          INTERPRETER HAYES:  Forgive me, Your Honor.  The
12  habit of interpreter response, I jumped and tried to
13  interpret it.
14          THE COURT:  So she said "We're cousins"?
15          INTERPRETER KRISTY:  (Nods head.)
16          THE COURT:  Go ahead.
17  BY MR. SANDERSON:
18  Q.   And how close of cousins are you?
19  A.   We're very close.  We love each other a lot.
20  Q.   And do you see each other a lot?
21  A.   Yes.
22  Q.   And do you often post photos together on social media?
23  A.   No, we're not really into the whole social media thing.
24  We're more reserved than that.
25  Q.   Why do you need to be reserved?

```
 1              INTERPRETER HAYES:  May the interpreter inquire?
 2    Singular or plural?
 3              MR. SANDERSON:  Singular you.
 4              THE WITNESS:  Excuse me?
 5              THE COURT:  What are you getting at here?  Are you
 6    insinuating a romantic relationship?
 7              MR. SANDERSON:  I am, Your Honor.  And I will have
 8    some photos, but I can't present them to her.  So I would
 9    admit them through Ms. Gamba after --
10              THE COURT:  Okay.  Well, why don't you ask a more
11    direct question.
12              MR. SANDERSON:  Okay.
13              THE COURT:  We're taking an awful long time on
14    this.
15              MR. SANDERSON:  Sure.
16    BY MR. SANDERSON:
17    Q.   Have you ever gone on a date with Mr. Carvaja?
18    A.   No, never.  He's my cousin.  We're practically brother
19    and sister.  I've always shared family-type times with him
20    because I didn't have a proper family with my own mother and
21    father.  And so I spent more time with my aunt and uncle.
22    Q.   And since Thiago came to the United States, have you
23    spoken with him?
24    A.   Yes.
25    Q.   When did you speak with him?
```

```
 1   A.    All the time, ever since he came.
 2   Q.    So the whole time that he's been here in the United
 3   States, you were keeping in touch with Thiago?
 4   A.    Oh, no, I thought the question was about Edison.  I
 5   guess I heard it wrong.
 6   Q.    I apologize.  I'll ask it again.  Since Edison came to
 7   the United States --
 8   A.    Yes, please.  Thank you.
 9   Q.    Since Edison came to the United States -- or, excuse me,
10   since Thiago came to the United States, have you spoken with
11   him?
12   A.    No, never.  I haven't had any contact.  We haven't had
13   any photographs, nothing.
14   Q.    And since Ms. Gamba came to the United States, have you
15   had any communication with her?
16   A.    No.  No, I have no contact with her.  She blocked us.
17             MR. SANDERSON:  No more questions, Your Honor.
18             THE COURT:  Any redirect?
19             MS. FISHER:  None, Your Honor.
20             THE COURT:  All right.  Ms. Vasquez, this is Judge
21   Trauger.  Are you in a room with Mr. Carvaja?
22             THE WITNESS:  No, at this time, I'm just at my
23   house.
24             THE COURT:  Okay.  So Mr. Carvaja is not with you?
25   You are at your house in Colombia?
```

```
 1                    THE WITNESS:  Yes, ma'am.
 2                    THE COURT:  Is anyone with you?
 3                    THE WITNESS:  At this time I'm with my mother, the
 4        one who brought me up.
 5                    THE COURT:  Okay.  Not Mr. Carvaja's mother, but
 6        your mother?
 7                    THE WITNESS:  Yes.  She's the mother of my -- the
 8        cousin of my grandmother, that is to say . . .
 9                    THE COURT:  Just give me her name.
10                    THE WITNESS:  Maria Biadineta something
11        DeGuterriez (phonetic).
12                    THE COURT:  Let me just ask Ms. Fisher.  This is
13        not the aunt, Diana?  This is not the aunt?
14                    MS. FISHER:  Correct, that is not the aunt, Diana.
15                    THE COURT:  Okay.  And this is not someone who's
16        going to be testifying; is that correct?
17                    MS. FISHER:  We do not intend for her to testify.
18        I don't -- I don't think so.
19                    THE COURT:  Okay.  Very good.
20                    And is the way that you think that Mr. Carvaja
21        paid for Ms. Gamba's apartment -- is that because Mr. Carvaja
22        told you that he paid for her apartment?
23                    THE WITNESS:  Yes, he always said that.
24                    THE COURT:  Okay.  Did Mr. Carvaja ever tell you
25        anything about Ms. Gamba going to Mexico?
```

1          THE WITNESS:  No, he never told me that.

2          THE COURT:  So he never told you that she went to

3    Mexico on vacation?

4          THE WITNESS:  No.  No, he didn't tell me that.

5          THE COURT:  Does Mr. Carvaja drink alcohol?

6          THE WITNESS:  Once in a while when there are

7    family get-togethers or parties or work get-togethers.

8          THE COURT:  Have you ever seen him drunk?

9          THE WITNESS:  No, not drunk.

10          THE COURT:  Are you aware of an incident where he

11   broke a window at the apartment where Ms. Gamba was living

12   with Thiago?

13          THE WITNESS:  No, she never told me about that,

14   and I was never aware of it.

15          THE COURT:  Anything else?

16          (No response.)

17          THE COURT:  All right.  Let's go to the next

18   witness.  Thank you.

19          THE WITNESS:  Thank you.

20          (Witness excused.)

21          MS. FISHER:  At this time, I'd like to call Diana

22   Vasquez.

23          THE COURT:  Ms. Vasquez, are you there?

24          THE WITNESS:  Yes, I'm here.

25          THE COURT:  All right.  Let's swear the witness.

1    COURT DEPUTY:  Raise your right hand.

2              DIANA VASQUEZ,

3    called as a witness, having been duly sworn, was examined and

4    testified as follows:

5              THE WITNESS:  Yes, I do.  Yes, I do before God.

6                    DIRECT EXAMINATION

7    BY MS. FISHER:

8    Q.   Ms. Vasquez, please state your full name slowly for the

9    court reporter.

10   A.   My name is Diana Eugenia Vasquez Rua.

11   Q.   Ms. Vasquez, where do you live?

12   A.   In Burlington, Ontario, Canada.

13   Q.   And how do you know Edison Carvaja?

14   A.   (No response.)

15             THE COURT:  Ask it again.

16             (Question repeated by interpreter.)

17   BY MS. FISHER:

18   Q.   Ms. Vasquez, can you hear us?

19   A.   Yes, I can hear you just fine.

20   Q.   How do you know Edison Carvaja?

21   A.   He's my nephew.

22   Q.   To the best of your knowledge, please describe your

23   family's involvement in Thiago's life.

24   A.   Well, we've always been very involved in Thiago's life

25   ever since he was born, until unfortunately he went to the

1    United States.

2    Q.   Can you describe how your family was very involved in

3    Thiago's life prior to him being retained in the United

4    States?

5              THE COURT:  Can we get a time --

6              THE WITNESS:  Well, ever since Paola was pregnant,

7    among all the cousins and everybody just accepted her as she

8    was with Edison, that she was his romantic interest.

9              THE COURT:  Ms. Vasquez, have you been living in

10   Canada since Thiago was born?

11             THE WITNESS:  Yes, ma'am.

12             THE COURT:  So everything you know about the

13   family's involvement with Thiago is what other family members

14   have told you; is that correct?

15             THE WITNESS:  What they've told me and also what

16   I've been able to share myself because I travel frequently to

17   Colombia.

18             THE COURT:  Go ahead.

19   BY MS. FISHER:

20   Q.   Ms. Vasquez, tell me about your interactions with Thiago

21   during your travels to Colombia.

22   A.   Well, whenever --

23   Q.   Wait just one moment.

24   A.   Well, normally when I go to Colombia, when we get

25   together -- we get together a lot because we have a very

1  large family.  And at any time that we'd all get together, we
2  always had a chance to share things with Paola and with the
3  little boy.  And I think that's pretty much my answer.  I
4  mean, when I was there and when I wasn't there, that was --
5  that was the way it was.  She was always with the family.
6  Q.    Ms. Vasquez, how many times did you travel to Colombia
7  after Thiago was born?
8  A.    I think personally that I saw the child must have been
9  four times or five.
10 Q.    Thank you.  Ms. Vasquez, have you provided an affidavit
11 for this Court's consideration today?
12 A.    Please?
13 Q.    Did you provide an affidavit for the Court dated March
14 13, 2018?
15 A.    Yes, ma'am.
16 Q.    Is everything in your affidavit true and accurate to the
17 best of your knowledge?
18 A.    Yes, all of that is real.
19        MS. FISHER:  Your Honor, at this time, I'd like to
20 move Ms. Diana Vasquez's affidavit into evidence as
21 Exhibit 13 to the hearing in this matter.
22        THE COURT:  Any objection?
23        MR. SANDERSON:  As long as I can cross-examine, no
24 objection on that.
25        THE COURT:  Have you seen it?

```
 1              MR. SANDERSON:  I have not seen it.
 2              THE COURT:  Well, why don't you look at it first.
 3              MR. SANDERSON:  (Reviewed document.)
 4         Your Honor, I have no objection contingent on
 5    having the opportunity to cross-examine --
 6              THE COURT:  Okay.  Fine.  Admitted.  Exhibit 13.
 7    Go ahead.
 8              MS. FISHER:  Thank you.
 9              (Petitioner Exhibit 13 received in evidence.)
10    BY MS. FISHER:
11    Q.    Ms. Vasquez, have you ever witnessed Mr. Carvaja
12    physically harm or abuse Thiago or Ms. Gamba?
13    A.    Never.
14    Q.    Are you --
15    A.    As I said in my sworn statement, he always showed
16    himself to be a loving father, and the two of them were very
17    affectionate as a couple.
18    Q.    Are you aware of any occasion upon which Mr. Carvaja
19    abused or harmed Thiago or Ms. Gamba?
20    A.    Never.  Never.  That is -- he always showed himself to
21    be very affectionate with them.  In general, he's a very
22    tender person.  What you were saying is just laughable.
23    Q.    Is Mr. Carvaja in your opinion trustworthy?
24    A.    Completely.  I trust him blindly.
25    Q.    To the best of your knowledge, was Mr. Carvaja aware of
```

1  Ms. Gamba's plan to illegally enter the United States in
2  July 2016?
3  A.    I don't know if they planned anything or not.   All I
4  know is that she always had wanted to come to the United
5  States.   Paola wanted to leave Colombia, and she had told me
6  that on several occasions.
7  Q.    Did you purchase a plane ticket for Ms. Gamba in
8  October 2016?
9  A.    Yes, I did.
10  Q.    Who asked you to purchase this ticket for Ms. Gamba?
11  A.    Kelly, Paola's sister.
12  Q.    Was Mr. Carvaja aware of the fact that you had purchased
13  a plane ticket for Ms. Gamba?
14  A.    I didn't talk with him about that.   I just spoke
15  directly about it to Kelly.
16  Q.    Ms. Vasquez, have you spoken to Ms. Gamba through
17  WhatsApp in the past several weeks?
18  A.    Yes.
19  Q.    Will you please describe your communication with
20  Ms. Gamba via the WhatsApp within the past several weeks?
21          MR. SANDERSON:   I object, Your Honor.   If they
22  have the records of their communication, they can just submit
23  them.   They're saveable, and they've been communicating.   I
24  don't see why they would need to testify --
25          THE COURT:   This is an admission of a party

1  opponent.  She may testify.

2          MR. SANDERSON:  Thank you.

3          THE WITNESS:  Will you repeat the question?

4  BY MS. FISHER:

5  Q.   Ms. Vasquez, will you please describe the substance of

6  your communication with Ms. Gamba via WhatsApp in the past

7  several weeks?

8  A.   I sent her a message on February 22nd, which was the day

9  after court, and I sent her another one on January 5th -- I

10 don't mean January, I mean March 5th.  And I just sent her

11 those two messages, not like she had testified to a whole

12 bunch of messages.

13         MS. FISHER:  Your Honor, for the record, I think

14 that Ms. Vasquez -- I will note that respondent has

15 introduced as their Exhibit No. 10 message from Diana Vasquez

16 to Paola Gamba, which I believe is dated February 22, 2018.

17 BY MR. FISHER:

18 Q.   Ms. Vasquez, at any point during that conversation, did

19 you threaten Ms. Gamba?

20 A.   Never.  My message was very clear.  First, why was she

21 getting us into a conflict over where -- a conflict where

22 Thiago would be in the middle of things between Edison and

23 Paola.  And in the second one I wrote to her, I told her that

24 I hoped she was asking God for the decision to be the best

25 thing for Thiago so that it wouldn't be all of these

emotions.  I also told her that I thought it was wrong of her

to use lies as her argument, because all of us knew that

she's the one who wanted to go to the United States with her

sister.  And she knew that I knew about it because Paola and

Kelly had talked about it, that when she was in the jail in

Texas that she -- they were talking about that.  And Kelly

said that when --

INTERPRETER HAYES:  Can you ask her to repeat?

THE WITNESS:  And that was when Kelly asked me for

some money, a loan, for Paola because she had ended up with

no money, and that was when I bought the plane ticket.

BY MS. FISHER:

Q.    Thank you.

A.    And I'd like to say that I'm not surprised at all that

she said lies because last December, when she and I talked,

she did it behind her sister's back because she didn't want

her sister to know that she was talking to me.

THE COURT:  Okay.  There's no outstanding

question.  So . . .

BY MS. FISHER:

Q.    Okay.  Thank you.  Ms. Vasquez, based on your knowledge,

were you aware of Mr. Carvaja at any point in 2016 or 2017

intending to move to the United States permanently?

A.    No.  In fact, he always managed his life, his traveling,

as a tourist.  And I'd like to add something else.  I wanted

1  to add something else that I forgot to say before that's part

2  of the message.

3         THE COURT:  We're going to have questions, not

4  speeches.  Tell her she has to wait for a question.

5         THE WITNESS:  Okay.

6  BY MS. FISHER:

7  Q.  Based on your knowledge, what was the purpose -- if you

8  know, what was the purpose of Mr. Carvaja's travel to the

9  United States in December 2016?

10 A.  He was coming to propose marriage to Paola.

11 Q.  Based on your knowledge, did Mr. Carvaja consent to

12 Ms. Gamba keeping Thiago in the United States permanently?

13 A.  No.  No, not permanently.  From what I understood, she

14 had taken the child on a trip to United States.

15        MS. FISHER:  I think that's all.  One moment, Your

16 Honor.

17        THE COURT:  All right.

18        MS. FISHER:  That's all for now.  Ms. Gamba's

19 attorney will have some questions for you next.

20        THE WITNESS:  Okay.

21                     CROSS-EXAMINATION

22 BY MR. SANDERSON:

23 Q.  Hi, Ms. Vasquez.  My name is Joel Sanderson, and I'm the

24 attorney for Ms. Gamba.  I'm going to ask you some

25 questions --

1  A.    Good afternoon.

2  Q.    I'm going to ask you some questions about your testimony

3  and about your affidavit.  Okay?

4  A.    Yes.

5  Q.    Before you moved to Canada, you came to the United

6  States; correct?

7  A.    Yes.

8  Q.    And in the United States, you applied for asylum;

9  correct?

10  A.    That's right.

11  Q.    And an immigration judge ruled against you on your

12  asylum application; correct?

13  A.    That's negative.

14  Q.    Excuse me.  So was your asylum application denied?

15  A.    I left it.  I didn't continue with the process.

16  Q.    And did you tell the truth on your application for

17  asylum?

18  A.    Completely.  If you'd like, I can send you the copies.

19  I still have them.

20  Q.    Are you allowed to come to the United States?

21  A.    Yes.  I've used it as a stopover on my way to Colombia.

22  Q.    And when you were going to Colombia, did you see

23  Ms. Gamba every time you visited?

24  A.    I've always seen Paola.  If you want -- I don't know

25  what you mean when you say "when I visited."

Q.    You said that after Thiago was born, but before he came
to the United States, you visited Colombia about four times;
correct?

A.    When they translated it, they didn't translate -- when
they translated it, they didn't translate it correctly.  I
said three or four times.  That's right.

Q.    And in those three to four times, did you see Ms. Gamba
every time?

A.    Always.

Q.    And how many days would you spend together during your
trips?

A.    When I go, I don't have a lot of time.  So sometimes --
you know, the whole family will get together.  So sometimes
when the family would get together, Paola would be there with
the child.

Q.    So on some of the short trips, you only saw her maybe
one time?

A.    I wouldn't know to tell you how many times because we
have a very large family.  So whenever we get together, there
are a lot of them.  We always try to share the maximum time
possible that we have together.

Q.    And when you visited, where did Ms. Gamba and Thiago
live?

A.    Okay.  When you live so far away from the country, and
you go and visit -- I knew that they spent most of their time

together, but I didn't know exactly where.  But I never went
to their house.  But every time that I ever saw them, they
were together, and it was very clear that they were a couple,
and that they lived together.  For how long, I don't know,
but I know that they shared most of the time together.

Q.    During your visits to Colombia, that's when you learned
that Ms. Gamba wanted to come to the United States; correct?

A.    Yes.

Q.    And did she talk to you about this?

A.    Yes.  And she was bedazzled by it.  She's one of these
women that likes luxuries.  She likes brand name clothing.
And whenever it would come up, she'd say, "Oh, I want to go
there because, you know, here I don't -- one doesn't have a
lot of opportunity to buy a lot of things."  It's always like
that with her, I mean.  And she's not the only one.  A lot of
people are like that, but she would do that a lot.

          THE COURT:  All right.  Wait for the next
question.

BY MR. SANDERSON:

Q.    And you said that everybody around her in Colombia knew
that she wanted to come to the United States and live with
her sister; right?

A.    Yes, she always talked about coming to the United States
with her sister.

Q.    And when she was talking about this, what was the plan

1  for Thiago?

2  A.   She never even mentioned the child.  She always just

3  would talk about United States.  It was like the maximum --

4  the biggest power, and that's just -- she talked about United

5  States.

6  Q.   And you didn't hear from her sister, Kelly Chambers,

7  until Ms. Gamba had already entered the United States; right?

8            INTERPRETER KRISTY:  May the interpreter inquire?

9  You didn't hear from --

10            MR. SANDERSON:  You didn't hear from Ms. Gamba's

11  sister, Kelly Chambers, about Ms. Gamba's trip to the United

12  States until after Ms. Gamba was already in jail in the

13  United States; right?

14            THE WITNESS:  Yes, Kelly contacted me once she was

15  already in jail.

16  BY MR. SANDERSON:

17  Q.   And did you discuss this with Mr. Carvaja?

18  A.   About what?

19  Q.   That Ms. Gamba was in the United States illegally.

20  A.   No, I didn't talk with him about that.  In fact, I'm a

21  very busy person.  Kelly was the one who contacted me.

22  Q.   So you weren't worried that Mr. Carvaja didn't know that

23  Ms. Gamba had been arrested by immigration in the United

24  States?

25  A.   I didn't call them because I don't like to get involved

1  in anyone's private life.

2  Q.  And did Ms. Gamba discuss all of the intimate secrets of

3  her life with you?

4  A.  Yes.  She's a person who talks quite a bit.

5  Q.  And when did you have these conversations?

6  A.  Which conversations?  What ones are you asking me about?

7  Q.  The intimate conversations with Ms. Gamba.

8  A.  Well, ever since I've known her, she always would share

9  things like that with me.  And then after that, through

10  social media.

11  Q.  So since she's come to the United States, have you seen

12  her in person?

13  A.  No, I haven't.

14  Q.  And you have a -- sorry.

15  A.  Only through video calls that she's done to me.

16  Q.  And you have a close relationship with Mr. Carvaja;

17  correct?

18  A.  I have a close relationship with all of my nephews and

19  nieces.  We have a very close family.

20  Q.  And Mr. Carvaja came and visited you in December 2017;

21  right?

22  A.  It wasn't September.  It was December 2017.  That's

23  correct.

24  Q.  And has Mr. Carvaja ever considered moving to Canada?

25  A.  Edison is a very successful person, as Paola has

commented through WhatsApp. He knows that if he came to this country or to the United States or move to any other, that he would have lost those five years of university, that he'd have to study all over again.

Q.    And Mr. Carvaja --

A.    So that's why he -- that's why I don't think that he's even considered that possibility because he's working in Colombia. He's successful. He's already graduated, and he has pretty much his life set up.

Q.    Mr. Carvaja knew that Ms. Gamba wanted to move to the United States with her sister; correct?

A.    Yes, he always knew that, but he thought that it was something that it was just a fad, that it would pass over time.

Q.    And when he brought Thiago to the United States, did he know that Ms. Gamba was in the United States?

INTERPRETER KRISTY:  What was the last part?

MR. SANDERSON:  Did Mr. Carvaja know that Ms. Gamba was in the United States?

THE WITNESS:  Of course.

BY MR. SANDERSON:

Q.    And was the plan for Thiago to be reunited with Ms. Gamba in the United States?

A.    The plan was that Thiago could see his mom because it had been many days since he had seen her.

```
1   Q.   So Thiago was brought to the United States so that he
2   could visit his mother?
3   A.   Yes.
4   Q.   And then Thiago was left in the United States; right?
5   A.   Yes.
6             MR. SANDERSON:  No more questions, Your Honor.
7             THE COURT:  Any redirect?
8             MS. FISHER:  Just briefly, Your Honor.
9                       REDIRECT EXAMINATION
10  BY MS. FISHER:
11  Q.   Ms. Vasquez, do you know if the plan was for Thiago to
12  remain in the United States permanently?
13  A.   Thiago only went to the United States to make a visit.
14  Q.   Do you know when the plan was for Thiago to return to
15  Colombia?
16  A.   It was my understanding that he was coming back with
17  Edison.  What happened after that, I don't know.
18            MS. FISHER:  Thank you.  That's all, Your Honor.
19            THE COURT:  Okay.  Ms. Vasquez, this is the judge.
20  I have a few questions for you.  Do you work out of the home,
21  and if so, what do you do?
22            THE WITNESS:  I'm a nursing assistant, and I work
23  here in a home for elderly people.
24            THE COURT:  And when you made application for
25  asylum in the United States, what was the basis for your
```

1  application?

2          THE WITNESS:  I've been a secretary in a funeral

3  home in Colombia, and I had received death threats because of

4  what was going on between the guerrilla and -- there was a

5  massacre that happened.

6          THE COURT:  Was this between drug cartels?

7          THE WITNESS:  No, it was with the guerrillas --

8  the guerrillas and the Colombian paramilitary.  The massacre

9  happened in the area where I worked, and it's something that

10  is still in the newspapers.

11          THE COURT:  Were there other members of your

12  family that were in danger?

13          THE WITNESS:  My immediate family, my husband and

14  my children, but, I mean, mainly it was mostly my husband and

15  me who were the most involved.

16          THE COURT:  Why did you abandon your asylum

17  application in the United States?

18          THE WITNESS:  Well, because the attorney for my

19  asylum said that it was really -- there had to be a very

20  strong case for political asylum, and that I had a friend in

21  Canada anyway, and I really liked Canada.  And she said that

22  there were opportunities.  So that's what I decided to do.

23  And I am proud to be a Canadian.

24          THE COURT:  Do these conflicts between guerrillas

25  and paramilitary take place in Medellin near where your

1  family lives?

2          THE WITNESS:  Those conflicts took place all over

3  the place, in many different places, not just in Medellin,

4  but the one that I'm talking about wasn't in Medellin.  It

5  was in Antioquia.

6          THE COURT:  How far away from Medellin is that?

7          THE WITNESS:  Like about three hours.

8          THE COURT:  Okay.  Thank you.  All right.

9          MS. FISHER:  Your Honor, could I have one brief

10  redirect question?

11          THE COURT:  Go ahead.

12          REDIRECT EXAMINATION CONTINUED

13  BY MS. FISHER:

14  Q.   Ms. Vasquez, in what year did you apply for political

15  asylum in the United States?

16  A.   It was 17 years ago, in 2001.

17          MS. FISHER:  Thank you.

18          (Witness excused.)

19          THE COURT:  All right.  Can we keep going, or do

20  we need a break?

21          MS. FISHER:  Your Honor, if we could have a brief

22  10-minute recess before Mr. Carvaja.

23          THE COURT:  That's fine.  We'll have a 10-minute

24  recess.

25          (Recess taken from 3:40 p.m. to 3:57 p.m.)

```
 1              THE COURT:  All right.  Next witness.
 2              MS. FISHER:  Your Honor, next witness for the
 3   petitioner is Edison Carvaja.
 4              THE COURT:  All right.  Mr. Carvaja, are you on
 5   the phone?
 6              THE WITNESS:  Yes, I'm here.
 7              THE COURT:  All right.  Mr. Carvaja, as you answer
 8   questions, don't give any more than a couple of sentences at
 9   a time because the interpreters have to interpret what you
10   are saying.
11              THE WITNESS:  Correct.
12              THE COURT:  Go ahead.
13              MS. FISHER:  Do you need to swear the witness in?
14              THE COURT:  Yes.  Let's swear the witness in.
15   Sorry.
16              COURT DEPUTY:  Raise your right hand.
17              EDISON ALBERTO CARVAJA VASQUEZ,
18   called as a witness, having been duly sworn, was examined and
19   testified as follows:
20              THE WITNESS:  I do.
21                        DIRECT EXAMINATION
22   BY MS. FISHER:
23   Q.   Mr. Carvaja, before we get started, can you hear the
24   interpreter sufficiently?
25   A.   At this moment, yes.
```

1    MS. FISHER:  Can you hear him sufficiently?  Can
2  the interpreter hear him sufficiently?
3    INTERPRETER KRISTY:  The interpreter would like to
4  request that the witness speak a little further away from the
5  phone and separate every word distinctly and speak slowly.
6    THE WITNESS:  No problem.
7  BY MS. FISHER:
8  Q.    Mr. Carvaja, please state your full name, for the
9  record.
10  A.    Edison Alberto Carvaja Vasquez.
11  Q.    Please describe your family's involvement in Thiago's
12  life prior to Thiago's retention in the United States.
13  A.    Could you repeat the question and define a little bit
14  that word involvement?
15  Q.    How often did your side of the family see Thiago when he
16  lived in Colombia?
17  A.    My family, which is my brothers and sisters and my
18  parents, had an opportunity to get together every weekend.
19    THE COURT:  Okay.  Next question.
20  BY MS. FISHER:
21  Q.    Have you completed your educational requirements to be a
22  lawyer in Colombia?
23    THE COURT:  Did you hear the question?
24    THE WITNESS:  Correct.  Yes, I did.
25  ///

BY MS. FISHER:

Q.    Have you passed the equivalent -- have you passed the equivalent of the bar exam in Colombia?

A.    Yes, I've passed that, and I finished my studies with sufficient -- with sufficient grades to be able to work in that field for five years.  At this moment, I am just about to pay for the fees for graduation and to celebrate my graduation ceremony.

Q.    Are the fees to apply for your right to graduate from law school very expensive?

A.    Well, it's always -- you always have to take it into account because it's a private university.

Q.    Okay.  So to be clear, you have completed your educational requirements and passed the bar exam, but you have not yet applied for your right to graduate; is that correct?

A.    Correct.

Q.    What was the purpose of your travel to the United States with Thiago in August 2016?

A.    My purpose was to travel with my son and for us to spend some time on our vacation with his aunt and his cousins.

Q.    To clarify, Mr. Carvaja, I'm asking about your travel to United States with Thiago in August 2016.

A.    Yes, of course.  The purpose was simply to take Thiago on a trip so that he could be with his Aunt Kelly Chambers

1  and her children.

2         THE COURT:  Next question.

3  BY MS. FISHER:

4  Q.   Did you suspect that Ms. Gamba was attempting to enter

5  the U.S. illegally when she left Colombia in July 2016?

6  A.   (No response.)

7  Q.   Mr. Carvaja, are you still on the line?

8         MS. FISHER:  Your Honor, may I check to see if --

9         THE COURT:  Yes.

10        MS. FISHER:  Mr. Carvaja, are you there?

11        THE WITNESS:  Yes, I am now.  The call got cut

12  off.

13  BY MS. FISHER:

14  Q.   Did you know that Ms. Gamba was attempting to enter the

15  U.S. illegally when she left Colombia in July 2016?

16  A.   I always knew her intention was to go to the United

17  States because I knew she had visited the embassy several

18  times.  As far as I know, she went three times.  She

19  presented herself to try and get a visa three times.  At one

20  time, she even said that she had tried five times.  So I

21  always knew that that was her intention.

22  Q.   Did you assist Ms. Gamba in planning her trip across

23  Mexico into the United States in 2016?

24  A.   No.

25  Q.   Did you financially assist Ms. Gamba in her trip through

1  Mexico to enter the United States illegally?

2  A.   I was aware that she was going to Mexico.  I knew that

3  she had left here, and that she was going to Mexico because

4  she told me, and she told her family.  After she was in

5  Mexico, she called me.  She said she was having difficulties

6  and asked if I could send money because she had made a

7  commitment to pay a certain amount of money, and she didn't

8  have it.  So I sent money to her.

9  Q.   Mr. Carvaja, does your son, Thiago, still have toys and

10 clothing in Colombia?

11 A.   Yes, of course.

12 Q.   Have you given away any of your son's toys or clothing

13 to anyone else?

14 A.   No.  Thiago's toys are in a box that my parents have

15 where they're storing it.

16 Q.   When you traveled to the United States in December 2016,

17 how much luggage did you bring for yourself?

18 A.   I just had light luggage with me, just clothes enough

19 for me to change and some little clothing for the boy also,

20 nothing out of the ordinary.

21 Q.   How many suitcases did you bring with you when you

22 traveled to the United States in December 2016?

23          INTERPRETER HAYES:  How many suitcases?

24          MS. FISHER:  (Nods head.)  Please repeat.

25          THE WITNESS:  Just one, my hand luggage.

1  BY MS. FISHER:

2  Q.   When you traveled to the United States in December 2016,

3  did you intend to return to Colombia?

4  A.   Yes, of course.  I always did.

5  Q.   Did you intend for your son, Thiago, to travel back to

6  Colombia with you?

7  A.   Yes.

8  Q.   Why did you permit Thiago to remain in the United States

9  when you returned to Colombia in January 2017?

10  A.   Because I wanted him to share some time with his mother

11  and with his aunt.  He seemed very happy with them, but also

12  remembering that Kelly was going to bring the child back

13  before his visa or the permission that he had was expired.

14  Q.   Did you consent to Ms. Gamba keeping Thiago in the

15  United States beyond the expiration of his travel visa?

16  A.   Never.  And that's why I'm in the middle of this

17  problem.

18  Q.   Did Ms. Gamba tell you that she planned to return to

19  Colombia with you and Thiago at some point?

20  A.   Yes, of course, because she accepted that because she

21  wanted to get married.  She accepted my proposal.  But she

22  also told me that she would really like to stay in the United

23  States, but I told her no.

24  Q.   Please repeat that last part.

25            INTERPRETER HAYES:  May the interpreter ask the

1  witness if he could back off the cell phone a little bit and

2  see if it helps?

3            THE COURT:  Yes.  Please back away from the cell

4  phone a little bit.  We'll be able to hear you better if

5  you're not so close to the cell phone.

6            THE WITNESS:  Okay.

7  BY MS. FISHER:

8  Q.    Thank you.  Could you repeat that last sentence one more

9  time, please?  Thank you.

10 A.    Paola told me that she would like for us to stay in the

11 United States, for us to just leave from there, and I told

12 her no because here I had a place that I was buying where I

13 planned to live with them, and also here in Columbia is where

14 I have my work and my stability.

15 Q.    Thank you, Mr. Carvaja.

16 A.    Okay.

17 Q.    Did Ms. Gamba tell you that she could drop her

18 application for political asylum in the United States at any

19 time?

20 A.    Yes, of course.

21 Q.    Did you at any point tell Ms. Gamba or anyone else that

22 you intended to remain in the United States permanently?

23 A.    No.  No, that's false.  My intention was always to come,

24 to travel around, to get to know the country.  That's all.

25 Nothing more.

1  Q.   Did you at any point tell Ms. Gamba or anyone else that
2  you consented to Ms. Gamba keeping Thiago in the United
3  States permanently?
4  A.   No, never.  I would never do that because I adore my
5  child.  What I wanted is to be by his side.  That's what I
6  wanted.
7  Q.   Thank you.
8  A.   And to educate him, to bring him up.
9  Q.   Mr. Carvaja, have you ever physically or sexually abused
10 Ms. Gamba?
11 A.   Never.  That's ridiculous.
12 Q.   Have you ever abused Thiago?
13 A.   Never.  I love my child.
14 Q.   Mr. Carvaja, are you aware that your Aunt Ora Ventura
15 has provided a notarized letter for the Court?
16 A.   Yes, of course.  She told me.  She's worried about my
17 son and about me.
18 Q.   Just one moment, Mr. Carvaja.
19 A.   No problem.
20         MS. FISHER:  Your Honor, once Mr. Sanderson has
21 had the opportunity to review, I'd like to move this into
22 evidence as long as he does not have any objection.
23         THE COURT:  This is not someone who's going to be
24 testifying?
25         MS. FISHER:  Correct, Your Honor.

```
 1              MR. SANDERSON:  I object because I don't
 2   understand why this individual isn't testifying.
 3              THE COURT:  Where is this person?  Where does she
 4   live?
 5              MS. FISHER:  She lives in South Carolina, Your
 6   Honor.
 7              THE COURT:  And why isn't she available to
 8   testify?
 9              MS. FISHER:  I believe because of her work
10   schedule.
11              THE COURT:  Well, he's objecting.  I'm not going
12   to accept a hearsay letter that can't be cross-examined.
13              MS. FISHER:  Okay.
14   BY MS. FISHER:
15   Q.   Mr. Carvaja, who is Luz Elena Alberto -- sorry, Luz
16   Elena Villegas Sanchez?
17   A.   She's one of my fellow workers.
18   Q.   Are you aware that she has provided an affidavit for
19   this Court today?
20   A.   Yes.
21              MS. FISHER:  Your Honor, at this time, once
22   counsel has had -- opposing counsel has had a chance to
23   review, I'd like to move into evidence an affidavit of Luz
24   Villegas.  She lives in Colombia, which is why she's not here
25   today.
```

1        THE COURT:  And we are listening to witnesses

2   testify from Colombia today.  So why isn't this witness

3   available to testify from Colombia like the other witnesses?

4   Don't know?

5        MS. FISHER:  I'm not sure, Your Honor.

6        THE COURT:  Okay.

7        MS. FISHER:  I have this translated from the

8   original Spanish into English, and you'll note there's a

9   certification at the end of it for the translation into

10  English.

11       THE COURT:  Given the astounding credibility

12  issues in this case, if there is an objection, I will not

13  receive this document.  We've got incredible conflicting

14  testimony and very, very serious credibility issues.  And so

15  papering up this record with affidavits and letters from

16  people who could have been available to testify -- this is

17  the third hearing we've had in this case.

18       The petitioner and his mother and I believe

19  another relative came all the way from Colombia.  Last

20  hearing, we had witnesses testifying from Colombia.  And I

21  haven't heard any good explanations for why a witness from

22  South Carolina and another witness from Colombia could not be

23  available to testify so they could be cross-examined.

24       MR. SANDERSON:  Your Honor, I do object on the --

25       THE COURT:  Okay.  I won't receive it.

BY MS. FISHER:

Q.   Mr. Carvaja, if Thiago is permitted to return to
Colombia, where would Thiago live?

A.   Of course he would be -- if he came back here, he would
be with me because that was always the plan, that he would
live with me here in my apartment.

Q.   And, Mr. Carvaja, do you have your own apartment that
you live in currently?

A.   At this time I live in a house which belongs to my
parents, but it's a very comfortable house, and we could be
there.   And that's where we would live until the apartment is
finished and delivered to me.

Q.   When will the apartment be finished?

A.   I'm going to get it a month from now.

          MS. FISHER:   That's all at this time, Mr. Carvaja.
Ms. Gamba's attorney will have some questions for you next.

          THE COURT:   Cross-examination.

          MR. SANDERSON:   Thank you.

                    CROSS-EXAMINATION

BY MR. SANDERSON:

Q.   Mr. Carvaja, this is Joel Sanderson.   I'm the attorney
for Ms. Gamba.

A.   Good afternoon, sir.

Q.   Now, in Colombia, it's the university that decides
whether somebody gets the title of lawyer; correct?

1  A.    I'm sorry.  Could you repeat the question?

2  Q.    In Colombia, the university is responsible for deciding

3  whether an individual receives the title of lawyer; correct?

4  A.    Correct.

5  Q.    And your university has not yet given you the title of

6  lawyer; correct?

7  A.    That's right.  I have not done the ceremony yet to get

8  the title, but I have finished my studies.  I will get the

9  title once we do the ceremony.

10 Q.    Now, when Thiago lived in Colombia, did he spend half

11 the nights sleeping at your home?

12         INTERPRETER KRISTY:  Half the nights?

13         MR. SANDERSON:  The nights.

14         THE WITNESS:  No, I saw my son every day.  He

15 would wake up every day in the apartment that I was paying

16 for, for Paola and my son.  And then sometimes on weekends, I

17 would wake up with him in the house that I was paying for.

18 BY MR. SANDERSON:

19 Q.    Now, you mentioned a new apartment.  Now, you started

20 paying for that back in 2015; is that right?

21 A.    Yes.

22 Q.    And what was your plan for that apartment?

23 A.    To live there with my family because I was going to get

24 married.

25 Q.    So in 2015, you were planning on getting married?

1   A.   No, it was always a plan for the future to give my son a
2   home.
3   Q.   This seems relevant -- pretty relevant to this case.
4   Why didn't you mention it before today?
5   A.   Why had I not mentioned what?
6   Q.   That you had started paying for an apartment for you to
7   live in with Thiago.
8   A.   Well, of course, I might not have mentioned it in court,
9   but I've always talked about it.  It's always been my plan to
10  have a home for my family where I could live with Paola and
11  my son.  It was my surprise wedding gift for Paola and my
12  son.
13  Q.   And you were planning to give that as a wedding gift
14  back in 2015?
15  A.   No, I talked about it.  I talked about it to Paola when
16  we got engaged in December of 2016.
17  Q.   Right now --
18  A.   I told her "Since you told me already that you do want
19  to marry me, I need to tell you that I already have the
20  apartment where we're going to live with our son."
21  Q.   And that apartment won't be available until next month;
22  correct?
23  A.   That's right.
24  Q.   And you said that the plan was for Ms. Gamba and Thiago
25  to move back from the United States into that apartment;

1  correct?

2  A.    That was always my intention, for my son to go with me.

3  I always wanted for my son and my wife to live with me, and

4  at that time that was going to be Paola because she had

5  accepted my marriage proposal logically.

6  Q.    In 2016, you lived with your parents; correct?

7  A.    Well, as I explained to the Court, I lived with Paola

8  and my son and in my own place.  Of course.  Of course, I

9  will.  I'd love to.

10           INTERPRETER KRISTY:  (Spoke to witness in

11  Spanish.)  Can you talk further away from the phone?

12           THE WITNESS:  Is this better?

13           INTERPRETER HAYES:  It's better this way.

14           THE COURT:  Did you live with your parents in

15  2016, or did you have your own separate apartment?  This is

16  the judge.

17           THE WITNESS:  I've always lived with my parents

18  and spent the weekends with Thiago in the apartment that I

19  was paying for.

20  BY MR. SANDERSON:

21  Q.    And right now you live in the same place that you were

22  living in 2016; correct?

23  A.    That's right.

24  Q.    Now, previously you stated that Thiago was not able to

25  live at that house in August of 2016.  What has changed that

1  would allow him to be able to live there now?

2  A.    My son has always lived with me.  I've never said not.

3  Q.    But he hasn't lived at your parents' house; correct?

4  A.    That's correct, but it's not because he cannot, which is

5  what the attorney wants to make it seem.  He can live with

6  me.  He just wasn't doing it because I was paying for him to

7  have his own apartment.

8            Furthermore, I'd like to say to the Court, that

9  apartment, I continue paying for it to December 2016.  Even

10  though my child was not in the country, I assumed the

11  responsibility of paying that rent because it was my

12  obligation to do so.

13  Q.    And you stopped paying in December of 2016; correct?

14  A.    Yes.

15  Q.    Now, you stated that you always knew that it was

16  Ms. Gamba's intention to come to the United States; correct?

17  A.    Yes.

18  Q.    And you knew that she wanted to come and stay with her

19  sister; correct?

20  A.    I always had wanted to visit the country and get to know

21  somewhere outside Colombia.  She had only just gotten to her

22  sister's house when she told me that we're staying here.  She

23  had only just gotten to her sister's house, and she got to

24  know the United States.  She told me in that December, when I

25  went, that she wanted to stay there.

Q.    So when she was in Colombia, her intention was to move
to the United States; right?
A.    When she was in Colombia, she always did whatever was in
her hands to be able to travel to United States.  Once she
was there, she told me that she wanted to stay then in the
United States.
Q.    After she told you that she wanted to stay in the United
States, why did you allow Thiago to remain with her?
A.    I thought it was just a passing fancy, that she told
me -- she told me that she wanted to stay there, but it
didn't worry me because I thought it was just something that
would pass.  And I knew that she didn't fulfill any of the --
any type of requirements for her to be able to stay there.
Q.    When Ms. Gamba came to the United States, before that,
in Colombia, she did not have a job; correct?
A.    That's right.
Q.    But she went on a vacation to Mexico; right?
A.    That's right.
Q.    And you had no idea that she was going to come to the
United States during that trip?
A.    Well, to be honest with you, I had my suspicions, but I
didn't think that she would really make such a bad decision.
Q.    So you hadn't talked to her about this at all?
A.    No, she told me, as she told her family, that she was
going to Mexico to the wedding of a friend of hers, and that

1  she was going to stay there for a few days.

2  Q.   And you said that your plan for your trip in August 2016

3  was for you and Thiago to take a vacation to visit his aunt

4  and cousins; right?

5  A.   No, my plan was to take my child, to go with my son, for

6  him to spend some vacation time with his aunt.  I wasn't

7  going to stay because I had to come back and go to work.  And

8  that's what I did, in fact.

9  Q.   When you initially filed a complaint against Ms. Gamba

10 in Colombia in February of 2017, you said that the only

11 reason -- or the reason that you left Thiago in the United

12 States was because he was having so much fun with his young

13 cousins and aunt; right?

14 A.   That's right.  Correct.  That's the way it was in

15 December, when I went back to the United States.  That was in

16 December of 2016, when I went back for my son.  You have to

17 realize he was there and being together with his aunt, with

18 his cousins and with his mom.  And I simply wanted him to

19 cement once again those ties with his mom, but never, ever,

20 for him to stay there permanently, never.

21 Q.   So the original plan was for him to come back with you

22 in January of 2017; right?

23 A.   That was my intention.

24 Q.   And --

25 A.   But I didn't do it because effectively his mom and Kelly

 1  had told me not to worry about it, that he could stay there

 2  for another month, and that then after that, Kelly would

 3  bring my child back to Colombia, and for me to just go on

 4  home and not worry about it.

 5  Q.   And when did you decide that it was okay for Thiago to

 6  stay for a little bit longer in January and February of 2017?

 7  A.   I made that decision there, before I even returned to

 8  Colombia.

 9  Q.   And did you make it --

10  A.   Because my initial intention was to go there and to

11  propose marriage, to get engaged, and to come back with my

12  son.

13  Q.   How many days before you returned to Colombia did you

14  change your mind and decide that it was okay for Thiago to

15  remain in the United States for a little while longer?

16  A.   That was maybe about a week before I left.  It was about

17  maybe a week before I made the trip.

18  Q.   And did you have a ticket for Thiago to return to

19  Colombia?

20  A.   No.  I was going to buy it from there because it would

21  have been more economical.

22  Q.   You previously testified that one reason that you don't

23  have the official title of lawyer is because of the high fees

24  for graduation; right?

25               INTERPRETER HAYES:  The interpreter cannot

1    understand the response.

2              THE WITNESS:  Yes, that's true.  It's true.

3    BY MS. FISHER:

4    Q.   But you were going to buy a ticket for Thiago back to

5    Colombia less than a week before his flight; correct?

6    A.   That's correct, but I was going to buy it with my card,

7    credit card.

8    Q.   And you testified earlier today that you found out -- or

9    Ms. Gamba told you that she was going to stay in the United

10   States shortly after she arrived at her sister's house;

11   right?

12             INTERPRETER KRISTY:  May the interpreter request

13   repeat of the question?

14             MR. SANDERSON:  Yes.

15   BY MR. SANDERSON:

16   Q.   You testified previously that Ms. Gamba told you that

17   she was going to stay in the United States shortly after she

18   arrived at her sister's house?

19             INTERPRETER KRISTY:  I'm sorry.  The interpreter

20   is having trouble with this question.  That she said before

21   or that --

22             MR. SANDERSON:  That shortly after she arrived at

23   her sister's house, that she told Mr. Carvaja that she was

24   going to stay in the United States.

25             THE WITNESS:  Well, ask the attorney what

1  exactly -- what dates are we talking about exactly?

2  BY MR. SANDERSON:

3  Q.   Just around when Ms. Gamba first told you that she was

4  going to stay in the United States.

5  A.   Well, no, she had told me that she had wanted to stay,

6  that she wanted to be in the United States, but that was when

7  she told me that we should stay, that she included me.  And I

8  told her that I didn't agree because I had arrived there

9  during my vacation time, and that my intention was to return.

10  I was going to go and then be there and then come back with

11  my son, but I could leave him there so that he could enjoy

12  their company for some days more.

13           THE COURT:  Okay.  Could we move on?

14           MR. SANDERSON:  Yes.

15           THE WITNESS:  But I never wanted him to stay there

16  permanently.

17  BY MR. SANDERSON:

18  Q.   And so you have a close relationship with your aunt,

19  Diana Vasquez, who testified; right?

20  A.   Yes, it's a nice relationship.  I mean, it's just like

21  with any close family, a caring, affectionate family

22  relationship.

23  Q.   And why did you go visit her in December 2017?

24  A.   Because it was my vacation time.

25           THE COURT:  Is this December, I'm sorry, 2016 or

1  2017?

2          MR. SANDERSON:  2017, Your Honor.

3          THE COURT:  There's no question pending.  Tell him

4  to not make speeches.  Wait for a question.

5          THE WITNESS:  Okay.

6  BY MR. SANDERSON:

7  Q.    And you also have a close relationship with Ana Maria

8  Vasquez?

9  A.    Yes, of course, I do.  She's my cousin.  We have a

10  family relationship.

11  Q.    And when Thiago --

12  A.    As I would with any cousin of mine.

13  Q.    When Thiago lived in Colombia, how often did he see Ana

14  Maria?

15  A.    Well, she would see us very frequently, me, Thiago and

16  Paola, because she worked at a shopping center that was

17  really close by the apartment, where she and my son,

18  Thiago -- and we also, whenever on a Sunday, when we had time

19  off, we would go and enjoy an afternoon with her at the

20  shopping center.  And my cousin, Ana, would see her.

21          INTERPRETER HAYES:  Can he repeat that?

22          THE WITNESS:  She would see him -- she would see

23  him and say hi to him, and she'd give him an ice-cream and

24  compliment my son and say that he looked really handsome.

25  ///

BY MR. SANDERSON:

1   BY MR. SANDERSON:

2   Q.    Okay.  Did you and Ms. Gamba fight ever when she was in

3   Colombia?

4   A.    Well, sure, we'd have arguments like any couple.

5   Q.    And there were times that her stepfather had to come and

6   prevent you from touching her; correct?

7   A.    That's completely false.

8   Q.    And there were --

9   A.    That's completely false.  They all were witnesses to the

10  good relationship that I had with her.

11               I'd like to add something.

12               THE COURT:  No.  We ask questions.

13  BY MR. SANDERSON:

14  Q.    And the photos that were submitted of Ms. Gamba's

15  wrists, those showed bruises caused by you; correct?

16  A.    That's false because -- those photos that she presented

17  are not pictures of her because I never mistreated her.

18  They're pictures where you can't see the face, and they're

19  undated.

20  Q.    In your --

21  A.    Those are images that anybody could use because I never

22  mistreated her.

23  Q.    Now, in your job, do you ever work on cases that involve

24  dangerous people?

25  A.    No, my work is focussed on pension issues, in other

```
 1  words, working with people who have reached pension age.
 2  Q.    So according to your testimony, you had no idea that
 3  Ms. Gamba was going to come to the United States and once --
 4  and when you left in January, you knew she wanted to stay,
 5  but you left Thiago anyway; correct?
 6            INTERPRETER KRISTY:  When he came back --
 7            MR. SANDERSON:  When he left back for Colombia,
 8  that he left Thiago with her even though he knew that she
 9  intended to stay here.
10            THE WITNESS:  Of course, but as I said, it was a
11  passing thing, I thought, because she had already become
12  engaged to me, and I had already even showed her the
13  apartment where it was that we were going to live.  So I just
14  thought it was a temporary thing because, I mean, she was
15  wanting to live in the house that we were going to live in
16  together.
17  BY MR. SANDERSON:
18  Q.    Was there ever a flight for Thiago purchased to Colombia
19  for February 2017?
20  A.    No, because when I was going to buy it for him, they
21  told me to wait a few days and not to buy it yet and for me
22  to go back to Colombia.
23            INTERPRETER HAYES:  The interpreter would like to
24  correct the record.
25            THE WITNESS:  So then after I got back to
```

Colombia, to my surprise, I found that she already had a
boyfriend, and that she did not want to come back with me
anymore and tried to impede contact with me with my son.  And
they went to move -- they moved to the city of Houston and
changed her phone number several times.

            MR. SANDERSON:  No more questions, Your Honor.

            THE COURT:  Any redirect?

            MS. FISHER:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. FISHER:

Q.    Mr. Carvaja --

A.    Okay.

Q.    -- you waited until you got to the United States in
December 2016 to buy return tickets for both yourself and
Thiago; correct?

A.    For Thiago, that's right.

Q.    Had you already purchased a return ticket to Colombia
for yourself?

A.    Of course I did.

Q.    Mr. Carvaja, do you recall providing me with several
pictures of yourself and Thiago in anticipation of the
hearing today?

A.    Yes, of course, I do.

Q.    Are these pictures of Thiago from the time of his birth
until December 2016?

A.    Yes, they sure are.

Q.    Are these pictures of you and Thiago both in the United States and in Colombia?

A.    Hello?

Q.    Can you hear me?

A.    I can hear you now.  Can you repeat the question, please?

Q.    Are these photos of you and Thiago in Colombia and in the United States?

A.    That's right.

          MS. FISHER:  Your Honor, I'd like to move photos of Mr. Carvaja and Thiago into evidence as Petitioner's Exhibit No. 14.

          THE COURT:  Any objection?

          MR. SANDERSON:  I object to simply that the -- for the lack of dates on any of the photos, but I'm fine with the admission.

          THE COURT:  Okay.  They'll be admitted.  Received. Exhibit 14; is that right?

          COURT DEPUTY:  Yes.

          THE COURT:  14.

          (Petitioner Exhibit 14 received in evidence.)

          MS. FISHER:  That's all, Your Honor.  Thank you.

          THE COURT:  Anything else?

          MR. SANDERSON:  No, Your Honor.

```
 1              THE COURT:  All right.  So no more rebuttal from
 2     the petitioner; correct?
 3              MS. FISHER:  Your Honor, we have one more witness,
 4     Luz Villegas, who's prepared to call in right now if you're
 5     ready for her.
 6              THE COURT:  Okay.  We are.  Is she on the phone,
 7     or do we know?
 8              MS. FISHER:  She said it would take her one minute
 9     to call in.  Luz Villegas, are you on the phone?
10              (No response.)
11              MS. FISHER:  She tried to call in earlier, Your
12     Honor, and didn't know how to put on the mute function.  So I
13     asked her to wait so that she didn't interrupt the earlier
14     testimony.
15              Ms. Villegas?
16              THE WITNESS:  Good afternoon.
17              MS. FISHER:  Hang on one moment, and the courtroom
18     deputy is going to swear you in as a witness.
19              COURT DEPUTY:  Raise your right hand.
20                  LUZ ELENA VILLEGAS SANCHEZ,
21     called as a witness, having been duly sworn, was examined and
22     testified as follows:
23              THE WITNESS:  (No response.)
24              THE COURT:  And is she in Colombia?
25              MS. FISHER:  Yes, Your Honor.
```

                THE COURT:  Medellin or somewhere else?

                MS. FISHER:  I will have her testify to that.  I

believe it's Medellin.

                THE COURT:  Okay.

                MS. FISHER:  Ms. Villegas, are you on the call?

                THE WITNESS:  (No response.)

                MS. FISHER:  Apologies, Your Honor.  One moment.

She got disconnected, so she's calling back in.

                Hi there.  Ms. Villegas?

                THE WITNESS:  Good afternoon.

                MS. FISHER:  Hi there.  We'll try this again.  I'm

going to have the court reporter swear you in.

                COURT DEPUTY:  Raise your right hand.

                       LUZ ELENA VILLEGAS SANCHEZ,

called as a witness, having been duly sworn, was examined and

testified as follows:

                THE WITNESS:  I swear that I will tell the truth

and all the truth and nothing but the truth.

                        DIRECT EXAMINATION

BY MS. FISHER:

Q.   Thank you, Ms. Villegas.  And please hold the microphone

a little further away from your mouth.

A.   Oh, sure.

Q.   Please state your full name for the Court.

A.   My name is Luz Elena Villegas Sanchez, and my national

```
 1   ID number is 4834335599, and my professional credential is --
 2             INTERPRETER KRISTY:  And I need that repeated,
 3   please.
 4             THE COURT:  Now, what was the full name?  I didn't
 5   hear that.
 6             INTERPRETER KRISTY:  Luz Elena Villegas Sanchez.
 7             THE COURT:  All right.  Okay.
 8             INTERPRETER KRISTY:  And you tell her -- Your
 9   Honor, may the interpreters tell her to please keep her
10   answers -- pause in the middle of her answers?
11             THE COURT:  You tell her.
12             (Interpreter spoke to witness.)
13             THE WITNESS:  Perfect.
14   BY MS. FISHER:
15   Q.    Ms. Villegas, where do you live?
16   A.    I live in the Rosales -- Los Rosales neighborhood.
17   Q.    Of what city and country?
18   A.    The country is Colombia, and the city is Medellin.
19   Q.    How do you know Edison Carvaja?
20   A.    I've known him since 2010 as --
21   Q.    Wait one moment.
22   A.    I've known him since 2010 as the senior official in the
23   20th Judicial Labor Court in Medellin.
24   Q.    Do you also work for the labor court in Medellin?
25   A.    He's been in my -- a fellow worker along with me in the
```

1  judicial branch.

2            INTERPRETER HAYES:  The interpreter did not have

3  an opportunity to interpret the question.

4            INTERPRETER KRISTY:  I think that's what she was

5  answering -- continuing her answer from before.

6            THE COURT:  No, I think she was understanding the

7  English.

8            INTERPRETER KRISTY:  Oh, okay.

9            THE COURT:  At any rate.  Do you need an

10 interpreter, or do you understand English, Ms. Villegas?

11           THE WITNESS:  No, I do need an interpreter because

12 I don't really have a perfect grasp of English.

13 BY MS. FISHER:

14 Q.   Ms. Villegas, did you provide an affidavit to the Court

15 in this matter on behalf of Edison Carvaja?

16 A.   Yes, I sent an affidavit, and I sent it by email.  Oh,

17 excuse me.  And with an attachment that was an email.

18 Q.   Is your affidavit --

19 A.   May I continue?

20 Q.   Just wait for the next question.  All right?  Is your

21 affidavit dated March 7, 2018?

22 A.   My what?

23 Q.   Your affidavit.

24 A.   Yes.  It's from the 7th of March.

25 Q.   Are the statements in your affidavit true and correct to

1  the best of your knowledge?

2         INTERPRETER HAYES:  Your Honor, the interpreter is

3  going to have her to slow down and also maybe back off the

4  mic a little bit more.  Is that all right?

5         THE COURT:  Okay.  Judith, why don't you tell her.

6  You tell her.

7         (Interpreter spoke to witness.)

8         THE WITNESS:  Oh, perfect.  Okay.

9         MS. FISHER:  Did the interpreters get her answer,

10  or do you need me to ask the question again?

11         INTERPRETER KRISTY:  No, didn't get anything.

12  BY MS. FISHER:

13  Q.   Are the statements in your affidavit true and correct to

14  the best of your knowledge?

15  A.   Yes, they are correct, and they are true.  And I stand

16  behind what I have stated.

17         MS. FISHER:  Your Honor, at this time, I'd like to

18  move into evidence as Exhibit 15 the affidavit of Luz Elena

19  Villegas.

20         THE COURT:  Any objection?

21         MR. SANDERSON:  No, so long as I have the

22  opportunity to cross.

23         THE COURT:  You do.  Will be received.

24  Exhibit 15.

25         (Petitioner Exhibit 15 received in evidence.)

1          MS. FISHER:  Ms. Villegas, those are all my

2    questions for right now.  The attorney for Ms. Gamba is going

3    to have some questions for you.

4          THE WITNESS:  Thank you.

5          MS. FISHER:  Please answer just the question that

6    he asks.  Speak slowly and pause between sentences for the

7    interpretation.

8          THE WITNESS:  Perfect.

9          MS. FISHER:  Thank you very much.  That's all at

10   this time, Your Honor.

11         THE COURT:  Okay.  Cross-examination.

12         THE WITNESS:  Thank you.

13                     CROSS-EXAMINATION

14   BY MR. SANDERSON:

15   Q.   Hi, Ms. Villegas.  This is Joel Sanderson.  I'm the

16   attorney for Ms. Gamba.  I'm going to ask you some

17   questions --

18   A.   Good afternoon.

19   Q.   -- about your affidavit.

20   A.   Perfect.

21   Q.   How did you know that Mr. Carvaja had assumed payments

22   for all of Thiago's care and activities?

23   A.   Excuse me?  What was that?  I couldn't hear the

24   beginning.

25   Q.   How did you know that Mr. Carvaja had assumed payments

1  for all of Thiago's expenses?

2  A.   I don't know exactly what the attorney means when he

3  says "all the expenses," but exactly -- I don't know that

4  exactly because as a fellow worker, I know him at work, and

5  then I know some of the families of the people I work with.

6  Q.   And how often did you see Thiago?

7  A.   I never saw him because he was the son of my fellow

8  worker, Edison Carvaja.  Let me finish.  I can attest --

9           INTERPRETER KRISTY:  She's saying "Hello."  She

10  doesn't think we hear her.

11           THE WITNESS:  I'd like to continue with my answer.

12  BY MR. SANDERSON:

13  Q.   I have another question, actually.

14  A.   Well, but I'd like to continue with my answer because I

15  didn't finish answering completely.

16           THE COURT:  Wait for the next question, please.

17  This is the judge.

18  BY MR. SANDERSON:

19  Q.   Now, you sent emails to Ms. Gamba in 2016; correct?

20  A.   No.  I'd like to clarify that it was Ms. Gamba who sent

21  me an email wanting me to make statements against Mr. Edison.

22  And I can prove it.

23  Q.   In 2016, did you ever send an email to Ms. Gamba?

24           INTERPRETER KRISTY:  She's got to start again.

25           THE WITNESS:  I don't recall if I sent any emails

1  in 2016 because Ms. Paola was sending me emails constantly,

2  including from January, even February 21st -- even on

3  February 21st, 2018, in which she asked me to please make a

4  statement against Edison, to which I never responded to her

5  because it would have been a lie.  And I want for the judge

6  to know.  This kind of thing that she's asking me for made me

7  very concerned about my own wellbeing and my own safety.

8  BY MR. SANDERSON:

9  Q.   And in that email, she asked you to send photos or

10 messages of you and Mr. Carvaja together; correct?

11            INTERPRETER HAYES:  Your Honor --

12            THE WITNESS:  And I attached -- I attached to my

13 statement -- I attached that email message.

14            THE COURT:  Ms. Villegas, you must listen to the

15 entire question in Spanish before you answer, please.

16            THE WITNESS:  Uh-huh.  Perfect.

17 BY MR. SANDERSON:

18 Q.   In the email, Ms. Gamba asked you to send photos or

19 messages of you and Mr. Carvaja together; correct?

20 A.   Can you repeat the question, please?

21            INTERPRETER HAYES:  May the interpreter inquire if

22 the witness is hearing the interpreter correctly?

23            (Interpreter spoke to witness.)

24            THE WITNESS:  At this time -- at this moment, yes,

25 but I just couldn't hear it at the beginning.

BY MR. SANDERSON:

Q.    In the email from Ms. Gamba, she asks you to send photos

or messages between the two -- between you and Mr. Carvaja;

correct?

A.    In the email message, that's one of the things she asked

for.

Q.    And she also said at one point that she didn't have

conversations with you, and that she isn't interested in

harming anyone with those conversations; is that correct?

A.    Excuse me?  No.  No.  I'm clarifying.

Q.    Go ahead.

            INTERPRETER HAYES:  Could counsel repeat the

question?

            THE WITNESS:  You mean about what?  What she said

in her email?

            THE COURT:  I don't think we need to get her to

affirm what is in the email.  It's in evidence.

            MR. SANDERSON:  Thank you, Your Honor.

BY MR. SANDERSON:

Q.    Did Mr. Carvaja discuss with you his plans with

Ms. Gamba?

A.    Yes, at work.  He said that they wanted to start a

project for a dwelling here in Medellin with his child and

family.

Q.    And Mr. Carvaja did not go to work on Saturdays and

1  Sundays because he was with Thiago; is that correct?

2  A.    Yes, I can directly state that on Saturdays and Sundays

3  he always shared those with his son.  And I know that because

4  of the photographs that he would show us to our whole work

5  group on Mondays.

6  Q.    You stated that --

7  A.    And I also know that they were engaged in activities of

8  a recreational type.

9  Q.    You stated in your affidavit that --

10  A.    I haven't finished answering.

11  Q.    I'm going to ask an additional question.

12  A.    Well, I was going to add to my -- I was going to finish

13  answering the prior question, but the attorney is not

14  allowing me.  He wants to do a new one.  So I shan't continue

15  with the prior question.

16  Q.    Now, Mr. Carvaja was -- would have been supposed to be

17  at work on Saturdays and Sundays with his group; correct?

18  A.    On occasions we had to -- and I wish to clarify this

19  with Mr. Attorney.  On many occasions on Saturdays and

20  sometimes on Sundays, we had to go to work in the morning

21  hours.  And I am personally aware that Mr. Carvaja did not

22  attend because he wanted to be with his child, and he wanted

23  to be present for his son's recreational activities.

24  Q.    Did he ever get in trouble for not attending these

25  workdays on Saturdays and Sundays?

```
1   A.    Could you please repeat that question in Spanish?
2              INTERPRETER HAYES:  The interpreter can repeat it.
3              MR. SANDERSON:  Sure.
4              (Question repeated by interpreter.)
5              THE WITNESS:  No.  He would leave all his work --
6   he would leave all his work done on Friday night.
7              THE COURT:  Can you move on?  I don't see the
8   pertinence of this.
9   BY MR. SANDERSON:
10  Q.   Were you ever in a romantic relationship with
11  Mr. Carvaja?
12  A.    Never.  In fact, I feel like with what Ms. Paola was
13  stating about me, that my integrity and my moral standing
14  have been affected, and I wish to state that I don't
15  understand why Ms. Paola sends me emails and calls me
16  demanding that I make statements against Mr. Edison Carvaja.
17  I wish for the judge to have knowledge of this because I feel
18  that it affects my safety.  It makes me concerned about my
19  safety.
20             THE COURT:  Ask the next question, please.
21  BY MR. SANDERSON:
22  Q.   In fact, you and Mr. Carvaja exchanged emails that were
23  romantic, didn't you?
24  A.    Romantic?  I don't understand that kind of question.
25  They were only emails referring to things that Ms. Paola has
```

1  said because she had Edison's email.  And the emails that --
2  I have knowledge that -- I have knowledge that Ms. Gamba
3  hacked into Edison Carvaja's email.  And I wish to state that
4  the email that she sent me on the 21st of February of 2018
5  utilizes an email name which is Brisa (phonetic), which is a
6  different person.
7          THE COURT:  Okay.  Next question.
8          THE WITNESS:  That is to say that --
9          THE COURT:  Next question, please.
10         MR. SANDERSON:  No more questions, Your Honor.
11         THE COURT:  Any redirect?
12         MS. FISHER:  No, Your Honor.
13         THE COURT:  Ms. Villegas, there has come into
14  evidence in this court -- this is the judge -- an email that
15  supposedly was sent by Mr. Carvaja to you on August 25th of
16  2016.
17         INTERPRETER HAYES:  Your Honor, 2016 or 2015?
18         THE COURT:  2016.
19         THE WITNESS:  And what does it say?
20         THE COURT:  And the email is from him to you.  And
21  it says (as read):  Darling, again, I am attaching the CD
22  that was in the hearing.  I went out for lunch.  I am sending
23  you 1,000 kisses.  I'll call you now, with three exclamation
24  points.
25         Did you receive that email from Mr. Carvaja?

1           THE WITNESS:  I wish to state to you, Your

2    Honor --

3           THE COURT:  That's a yes-or-no question.  Yes or

4    no?

5           THE WITNESS:  Well, certainly, if there's a -- if

6    we're talking -- if we're talking about a CD, I did receive

7    an email that had a CD, and that was at work.  And that was

8    about a CD.  And daily amongst all of the group in our work

9    group we always use -- we had email messages amongst one

10   another.  I don't understand.

11          THE COURT:  I read you the email where he called

12   you --

13          THE WITNESS:  I don't understand why the attorney

14   is referring to --

15          THE COURT:  Tell her to wait for my question.  I

16   read you the email where he called you "Darling" and said he

17   was sending you 1,000 kisses.

18          Did you receive this email?  Yes or no?

19          THE WITNESS:  Yes.  That was sent a long time ago,

20   and I receive thousands of emails every -- all the time.

21   And . . .

22          THE COURT:  I understood you to say that you did

23   receive this email.  Am I correct?

24          THE WITNESS:  But I want to clarify that this was

25   more than two years ago, and that I receive everyday a large

1  quantity of emails.

2          THE COURT:  Thank you.

3          THE WITNESS:  It was probably something to do with

4  work because I was being provided with a CD.

5          THE COURT:  Okay.  Thank you.

6          MS. FISHER:  Brief redirect, Your Honor?

7                    REDIRECT EXAMINATION

8  BY MS. FISHER:

9  Q.   Ms. Villegas, this is Alex Fisher.  I have one more

10 question for you.

11 A.   Excuse me?

12 Q.   Please speak very slowly in your response.  Was it

13 routine for Mr. Carvaja to send work emails with affectionate

14 language in them to you and other coworkers?

15 A.   Well, I would like --

16 Q.   Wait one moment.

17 A.   I would like to clarify that we used to send lots of

18 emails back and forth amongst ourselves and . . .

19 Q.   Continue.

20          INTERPRETER KRISTY:  Tell her to repeat.

21          THE WITNESS:  And about that email, if that's not

22 evidence of any supposed --

23          MS. FISHER:  Wait one moment.

24          THE WITNESS:  That email is not evidence of any

25 supposed romantic relationship between us as is alleged by

1  the attorney of Ms. Gamba.

2          MS. FISHER:  That's all.  Thank you, Ms. Villegas.

3          THE COURT:  Any other questions from Ms. Gamba's

4  lawyer?

5          THE WITNESS:  Thank you.

6          MR. SANDERSON:  Your Honor, I have four additional

7  emails that are somewhat more extensive.

8          THE COURT:  Have you shown them to opposing

9  counsel?  Show them to opposing counsel.

10          MS. FISHER:  Your Honor, at this time, we would

11  object because translator Jama Rinehart at counsel's table is

12  not a certified translator for the federal courts in this

13  matter.  And if Your Honor chooses to admit them --

14          THE COURT:  Well, we can have them translated

15  right here in court by the translators.  If you insist on

16  that, it's going to take a lot longer, but if that's your

17  objection, these would -- is that your only objection to the

18  receipt of them?

19          MS. FISHER:  That is my only objection, Your

20  Honor.

21          THE COURT:  Okay.  All right.  So I will let

22  you -- you want to admit these as a collective exhibit, or

23  what do you want to do?

24          MR. SANDERSON:  Yes, Your Honor.

25          THE COURT:  Okay.  We'll make these Collective

```
 1   Exhibit --
 2              COURT DEPUTY:  11.
 3              THE COURT:  Okay.  Collective Exhibit 11 for the
 4   respondent.
 5              (Respondent Exhibit 11 received in evidence.)
 6              THE COURT:  Okay.  And you may question -- let's
 7   see.  You don't have copies of these?
 8              MR. SANDERSON:  I have more.
 9              THE COURT:  Okay.  This is the way I'd like to
10   handle this in the interest of time:  Tell the witness that
11   the interpreter is going to read an email supposedly sent --
12   all of these are sent by Mr. Carvaja, I guess -- sent by
13   Mr. Carvaja to her on such and such a date, and she is to
14   simply say whether or not she received that email.  Okay?
15              MR. SANDERSON:  Your Honor, I would request that
16   the interpreter actually read the one from 2013 that is from
17   Ms. Villegas to Mr. Carvaja.  It's titled "Baby Doll."
18              THE COURT:  What's the date on that?
19              MR. SANDERSON:  The original date on her email was
20   March 18, 2013.  The top date is December 30, 2014.
21              THE COURT:  Okay.  However -- whatever order you
22   want to do them in, but let me explain it to her.
23              MS. FISHER:  Your Honor --
24              THE COURT:  Yes?
25              MS. FISHER:  -- I apologize.  Before you begin,
```

 1   one additional objection is that the date of these is prior
 2   to Thiago's birth, I believe, except for the last one, which
 3   is 2016.  I object on the basis of relevance to this
 4   proceeding here today.
 5           THE COURT:  Well, it really goes to credibility, I
 6   believe, because she has testified that she has never had a
 7   romantic relationship with Mr. Carvaja.  So it seems to me
 8   that these all go to her credibility.  So overruled.
 9           MS. FISHER:  Okay.
10           THE COURT:  Ms. Villegas, we have been presented
11   with additional emails between you and Mr. Carvaja.  And the
12   interpreter is going to read them one at a time to you in
13   Spanish, and all we want for you to say is "Yes, I received
14   this email," or "No, I did not receive that email."
15           Do you understand the process we're going to go
16   through?
17           THE WITNESS:  Yes.  Yes.  Yes, I did receive other
18   emails.
19           THE COURT:  Well, you listen and see if you
20   received these emails.  Okay?
21           THE WITNESS:  If I received them?
22           THE COURT:  Ask a question.
23                     RECROSS-EXAMINATION
24   By MR. SANDERSON:
25   Q.  Ms. Villegas, the interpreter is going to read an email

from you to Mr. Carvaja from 2013 titled "Baby Doll." And
please allow the interpreter to read the entire email. And
at the end confirm yes or no whether you sent this email.

INTERPRETER HAYES: If you received it or not?

MR. SANDERSON: If she sent it.

INTERPRETER HAYES: Just to be clear, I'm reading
the version in English translating it into Spanish?

MR. SANDERSON: There's a version in Spanish with
it.

THE COURT: Read the Spanish one.

INTERPRETER HAYES: I'm reading the Spanish to
her?

THE COURT: Go a couple pages back, and you'll see
the -- and are you going to ask her about the previous one
from him and then her response?

MR. SANDERSON: Yes, Your Honor, that makes sense.
On the second page, there's an email from him to
her. Could you read that one first to her, and then we'll
proceed to the next.

INTERPRETER HAYES: Could counsel physically show
me which one you'd like me to read first? Because I don't
want to be in control of that part of the operation.

THE COURT: You know, we are going to be here all
night if we do this by simultaneous translation. I would
like for the interpreter who has been functioning in the

courtroom today and who did these translations to tell me
what your qualifications are.  She's not a certified court
interpreter, but she has been interpreting for the -- she has
been interpreting for the respondent.

        MS. RINEHART:  Yes.  I have a Master's degree from
the University of La Laguna in Spain, and then I also have a
certificate of translation from the University of San Diego
Extension, which is in -- University California San Diego
Extension in California.

        THE COURT:  And where are you employed?

        MS. RINEHART:  I work at the office of
Mr. Sanderson.

        THE COURT:  Okay.  You work at his law office?

        MS. RINEHART:  That is correct.

        THE COURT:  So you are translating on a daily
basis?

        MS. RINEHART:  Yes.  And interpreting, Your Honor.

        THE COURT:  All right.  I'm going to admit these
with the translations that have been furnished by the person
who just gave us her credentials.  I will allow the
petitioner to file at a later time alternative translations
of these emails that are prepared by a certified court
interpreter in case there are some slight differences.  My
feeling is that there probably will be very slight
differences.

1          And what I would like for Mr. Sanderson to do is
2    to -- we don't need to read these entire emails to her, but
3    you can read portions of them to her and say "Did you send
4    this," or "Did you receive this," and so forth.  And we will
5    go from there.  But it is now 6:10.  We have been at it since
6    1:30.  This is our third day of this hearing.  We still have
7    two additional witnesses to listen to.

8          And so that is why we're handling it in this way.
9    And let me let Ms. Fisher make any statement she wishes to
10   make.

11          MS. FISHER:  Thank you, Your Honor.  I would just
12   like to make a brief objection on the record to the
13   translation, not based on Ms. Rinehart's qualifications, but
14   rather her potential for bias because she does work for the
15   same law firm that is the attorney representing Ms. Gamba in
16   this case.  I just want that noted on the record.

17          THE COURT:  Okay.  Very good.

18   BY MR. SANDERSON:

19   Q.   Okay.  Ms. Villegas, did you, on March 18, 2013, send an
20   email to Mr. Carvaja that states, in part "I miss you and am
21   dying to make love to you too"?

22   A.   Hello?  Hello?  Yes.  Can you repeat it, please?

23   Q.   (Question repeated by interpreter.)

24   A.   Email, yes.  No, not that.  I don't use those words, not
25   with Edison.  And I have never sent anybody those kinds of

1  words.

2  Q.   Did you ever send an email that also -- that continued

3  that "Only thinking of how promiscuous you are makes me

4  angry, and I no longer want to do anything"?

5  A.   No, never.  Those aren't my words.

6  Q.   And in that same email, did you write "And I hope that

7  what you have done to me you haven't done to others"?

8  A.   No.  No, not -- those aren't my words, but the one that

9  we were talking about before that I got in 2013, yes, because

10  that has something to do with work and the job that I had to

11  do at the court.  Hello?

12              THE COURT:  Go on to the next one.

13              MR. SANDERSON:  Yes.

14              THE WITNESS:  Look, I'd like to --

15              THE COURT:  Wait for the next question, please.

16  BY MR. SANDERSON:

17  Q.   Ms. Villegas --

18  A.   No, but I want to clear something up.  I want to clarify

19  something.

20  Q.   I have an additional question for you about a different

21  email.

22  A.   But can I clear up my previous answer?

23              THE COURT:  Go ahead.

24              THE WITNESS:  Your Honor, I wish to clarify that

25  Ms. Paola hacked Edison's email.  And I know because -- I

know because she sent me an email passing herself off as him,
several emails.  And I wish to state that Ms. Paola -- and I
don't know for how long.  And I have direct knowledge because
she wrote an email to me passing herself off as him.  In
fact, in that email, she explained that she, Ms. Paola, is
passing herself off as Brisa.

     THE COURT:  Okay.  Thank you.  Next question.

     THE WITNESS:  And I don't understand why.

BY MR. SANDERSON:

Q.  Ms. Villegas, on August 14, 2016, did you receive an
email from Mr. Carvaja with the subject "Colpe Reply
2014-845"?

     INTERPRETER HAYES:  The title of the email?

     MR. SANDERSON:  "Colpe Reply 2014 --"

     THE COURT:  How is she going to remember that?
Why don't you ask her about the content, Mr. Sanderson.

     MR. SANDERSON:  Okay.

BY MR. SANDERSON:

Q.  And in that email, did it state that "Hi, Darling.  Good
morning.  How do you sleep?  Darling, with this email -- Hi,
Darling.  Good morning.  How did you sleep?"

     INTERPRETER HAYES:  Counsel, one moment, please,
while the interpreter locates --

     MR. SANDERSON:  Sure.

     THE WITNESS:  Hello?

1          MR. SANDERSON:  "Darling, with this email, I am

2    attaching cole pension reply and the evidence that presented

3    with it."

4          THE COURT:  Mr. Sanderson, don't read this entire

5    email.

6          MR. SANDERSON:  I'm not, Your Honor.  I'm solely

7    trying to give context.

8    BY MR. SANDERSON:

9    Q.   And then at the end of the email, it stated "I am

10   sending you a kiss.  I await your reply, Darling.  And see

11   you soon."

12          Did you receive that email from Mr. Carvaja?

13   A.   Did I what?  No.

14          THE COURT:  No.  Move on to the next one.  She

15   said she didn't receive it.  Move on to the next one, please.

16          MR. SANDERSON:  Yes, Your Honor.

17   BY MR. SANDERSON:

18   Q.   On December 7, 2016, did you receive an email that

19   begins "Hi, Pretty Muffin --"

20   A.   Hello?

21          MS. FISHER:  Joel, I don't think we have the email

22   you're asking about right now.

23          MR. SANDERSON:  (Indicating.)

24          MS. FISHER:  Thank you.

25   ///

1  BY MR. SANDERSON:

2  Q.   "Doll, I'm attaching two settlements that are already

3  ready so that you can review them and send the information to

4  the clients below."

5          INTERPRETER HAYES:  Counsel, the interpreter needs

6  to make sure she's on the right email.  One moment.

7          MR. SANDERSON:  Yes.

8          THE COURT:  December 7th of 2016.  At the top,

9  it's December 13th from her.  And then the second one down.

10          INTERPRETER HAYES:  I've got it.  Thank you.

11          THE WITNESS:  Well, I'd like to point out that the

12  attorney is showing me -- is reading out emails that are from

13  2013, 2017, and then something, something, something, and I

14  receive hundreds of emails all the time.

15          INTERPRETER HAYES:  Your Honor, the interpreter is

16  going to say it's impossible to interpret if the witness is

17  speaking at the same time as the interpreter, and the

18  interpreters cannot hear what she says to begin with.

19          THE COURT:  Yes.  Yes.  Wait for the entire

20  question to be interpreted for you, Ms. Villegas, before you

21  speak, please.

22          THE WITNESS:  Yes.  I'm going to speak with more

23  pauses because I don't think that my answer has come out very

24  clearly.

25  ///

1  BY MR. SANDERSON:

2  Q.  Did you ever receive an email from Mr. Carvaja, or do

3  you recall receiving an email, that said something along the

4  lines of "I'm sending you a kiss tonight.  I'll call you

5  tonight.  You have a beautiful day, Gorgeous"?

6  A.  Yes.  No.  Over time I have received many emails from

7  Edison, not just those, and they had to do with carrying out

8  our work.

9           THE COURT:  She said she didn't receive an email

10 that had this language in it.  That's my understanding of her

11 answer.

12          MR. SANDERSON:  Yes, Your Honor.

13          THE WITNESS:  And I'd like to state . . .

14          THE COURT:  Ask another question.

15 BY MR. SANDERSON:

16 Q.  Ms. Villegas, do you recall ever receiving an email from

17 Mr. Carvaja that ends "I'm sending you a kiss"?

18 A.  Not that I can remember, no.  Not that I can remember, no.

19          MR. SANDERSON:  No more questions, Your Honor.

20          THE COURT:  Okay.  Any examination?

21          MS. FISHER:  No, Your Honor.

22          THE COURT:  All right.  Thank you, Ms. Villegas.

23 We're finished with your testimony.  Okay.  It is now 6:20.

24 As I understand it, the only other witnesses are the

25 respondent and her sister.

1          MR. SANDERSON:  Yes.

2          THE COURT:  And do you have any estimate of how

3    long this testimony will be?

4          MR. SANDERSON:  Less than an hour-and-a-half

5    combined.

6          THE COURT:  Well, I don't think I'm going to make

7    everyone stay until 8:00 tonight.  Would you go get my

8    calendar, please?

9          MS. FISHER:  Your Honor, I'm corresponding with my

10   client to confirm that he's available once we know your

11   calendar.  So I'll try and do that as much in realtime as

12   possible.

13         THE COURT:  Okay.  Does 9:30 on Tuesday morning

14   work, the 27th of March?

15         MS. FISHER:  I'm available at that time, Your

16   Honor.  I'll verify with my client right now.

17         THE COURT:  Okay.

18         MR. SANDERSON:  Your Honor, I can make that work.

19         THE COURT:  Okay.  Can our witness be here?

20         MS. CHAMBERS:  Yes.

21         MS. FISHER:  Your Honor, while we wait for

22   Mr. Carvaja to respond, may we submit an additional certified

23   interpreted translation of Exhibit 9, which was the first

24   email for the same reasons previously stated in court?

25         THE COURT:  Let's see.  This is the Respondent's

```
 1   Exhibit 9?
 2              MS. FISHER:  Correct, Your Honor.
 3              THE COURT:  So what came in from the respondent is
 4   the translation by Ms. Rinehart, who's here in court that we
 5   just talked to?
 6              MS. FISHER:  Yes, Your Honor.
 7              THE COURT:  Okay.  And you have a different
 8   translation?
 9              MS. FISHER:  We would simply like to submit one by
10   a certified interpreter of the court for the reasons
11   previously stated that she is not certified, and that she
12   also works for Mr. Sanderson.
13              THE COURT:  Okay.  Is it different?  Where is it?
14              INTERPRETER HAYES:  She doesn't have it yet.
15              THE COURT:  What?
16              INTERPRETER HAYES:  She doesn't have one yet.
17              THE COURT:  Oh, you're requesting permission to do
18   that?
19              MS. FISHER:  Yes.
20              THE COURT:  Yes, you may do that.  Sorry.
21              MS. FISHER:  Thank you.  And, yes, Your Honor,
22   9:30 next Tuesday, the 27th, works for Mr. Carvaja as well.
23              THE COURT:  And that works for all of you.  So we
24   will reassemble once again.  All right.  We're in recess.
25                   (Proceedings adjourned at 6:30 p.m.)
```

1          REPORTER'S CERTIFICATE

2          I, Patricia A. Jennings, Official Court Reporter

3  for the United States District Court for the Middle District

4  of Tennessee, with offices at Nashville, do hereby certify:

5          That I reported on the Stenograph machine the

6  proceedings held in open court on March 20, 2018, in the

7  matter of EDISON ALBERTO CARVAJA VASQUEZ vs. PAOLA ANDREA

8  GAMBA ACEVEDO, Case No. 3:18-cv-00137; that said proceedings

9  in connection with the hearing were reduced to typewritten

10  form by me; and that the foregoing transcript (pages 1

11  through 93) is a true and accurate record of said

12  proceedings.

13          This the 11th day of June, 2018.

14

15

16

17

18                    /s/ Patricia A. Jennings
                      Patricia A. Jennings, RMR, CRR
19                    Official Court Reporter

20

21

22

23

24

25