UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


EDISON ALBERTO CARVAJAL VASQUEZ    )
                                   )
VS                                 )   No. 3:18-cv-0137
                                   )
PAOLA ANDREA GAMBA ACEVEDO         )
_____




BEFORE THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

TRANSCRIPT OF PROCEEDINGS

(through Spanish interpreters)

March 27, 2018

_____









_____

**Roxann Harkins, RPR, CRR**
Official Court Reporter
801 Broadway, Suite A837
Nashville, TN 37203
615.403.8314
roxann_harkins@tnmd.uscourts.gov

1 **APPEARANCES:**

2 For the Petitioner:     ALEXANDRIA SCARBROUGH FISHER
                         Frost Brown Todd
3                        150 Third Avenue South
                         Suite 1900
4                        Nashville, TN 37201

5

6

7 For the Respondent:    JOEL HUGH SANDERSON
                         Monarch Immigration Rights
8                        Advocates
                         5252 Hickory Hollow Parkway
9                        Suite 270A
                         Antioch, TN 37013
10

11 Interpreters:         Heather Hayes

12                       Judith Kristy

13

14                      **I N D E X**

15 Petitioner's witnesses

16 **ELANA VASQUEZ**

17 Rebuttal Direct Examination By Ms. Fisher ..........8
   Rebuttal Cross-Examination By Mr. Sanderson ........9
18

19 Respondent's witness

20 **PAOLA GAMBA**

21 Rebuttal Direct Examination By Mr. Sanderson .......11

22 Continued Rebuttal Direct Examination By Mr. Sanderson22
   Rebuttal Cross-Examination By Ms. Fisher ..........34
23 Rebuttal Redirect Examination By Mr. Sanderson .....43
   Rebuttal Recross-Examination By Ms. Fisher ........46
24 Rebuttal Redirect Examination By Mr. Sanderson .....47
   Rebuttal Recross-Examination By Ms. Fisher ........49
25

**LAURA VANESSA OQUENDO RUIZ**

Direct Examination By Mr. Sanderson ................16
Rebuttal Cross-Examination By Ms. Fisher ..........19

Petitioner's witness

**EDISON VAZQUEZ CARVAJAL**

Surrebuttal Direct Examination By Ms. Fisher .......50
Surrebuttal Cross-Examination By Mr. Sanderson ....53.

# E X H I B I T S

Petitioner No. 16....Collective exhibit of emails .35
            between respondent and Luz Elena Villegas
            Sanchez
Petitioner No. 17....Screenshots of What's App ....36
            conversations

Respondent No. 12....Lawyers 2018 - ...............19
            Administrative requirements to obtain an
            academic title
Respondent No. 13....Tax assessment records from ..25
            respondent's mom and dad's house
Respondent No. 14....Photographs of clothing worn .28
            by petitioner
Respondent No. 15....Email response from ..........30
            respondent to US Department of State
            (Response to Exhibit 8 email)

1

2          The above-styled cause came to be heard

3     on March 27, 2018, before the Hon. Aleta A. Trauger,

4     District Judge, when the following proceedings were

5     had at 9:37 a.m. to-wit:

6

7          THE COURT:  Good morning.  Let's swear

8     the interpreters.

9               (Interpreters sworn.)

10          THE COURT:  All right.  We are here in

11    hopefully our last chapter of this Hague Convention

12    case of *Edison Carvajal versus Paola Gamba*.  We have

13    Alex Fisher for the petitioner.  We have Joel

14    Sanderson for the respondent.  The petitioner is on

15    the phone; is that correct, Ms. Fisher?

16          MS. FISHER:  Yes, Your Honor.

17          THE COURT:  Okay.

18          MS. FISHER:  To the best of my

19    understanding right now.

20          THE COURT:  Okay.  Mr. Carvajal, are you

21    there on the phone?  Mr. Carvajal?

22          MR. CARVAJAL:  Yes, it's me here.

23          THE COURT:  Okay.  And Ms. Gamba, the

24    respondent, is here in the courtroom.

25               And we have an interpreter from the

1　　respondent's lawyer's law firm interpreting for her,

2　　Jama Reinhardt.

3　　　　　　So my memory is that we had additional

4　　rebuttal from the petitioner, which was going to

5　　consist only of additional testimony from

6　　Mr. Carvajal.  And then we were going to have rebuttal

7　　from the respondent.  Is that correct, Ms. Fisher?

8　　　　　　MS. FISHER:  Your Honor, I'd like to

9　　reserve the right to call Mr. Carvajal.  At this time

10　I don't know if he'll be needed.

11　　　　　　THE COURT:  Okay.

12　　　　　　MS. FISHER:  I'd like to reserve that

13　right.

14　　　　　　THE COURT:  Okay.  And you are going to

15　call the petitioner -- the respondent?

16　　　　　　MR. SANDERSON:  I'm going to call the

17　petitioner, and then I have one piece of evidence --

18　　　　　　THE COURT:  You're going to call the

19　respondent, not the petitioner.

20　　　　　　MR. SANDERSON:  Yes, respondent.  And

21　then I have one piece of evidence that an attorney

22　from Colombia, we would call him just to authenticate

23　that piece of evidence and how that was obtained.

24　　　　　　THE COURT:  Okay.  All right.

25　　　　　　MS. FISHER:  And, Your Honor, I

1    apologize.  I would like to reserve the right to call

2    potentially one more additional witness who would be

3    Elana Vasquez, Mr. Carvajal's mother, just for a brief

4    line of questioning.

5              THE COURT:  All right.  We had the

6    petitioner's rebuttal witnesses at our last hearing.

7    We had Ana Vasquez.  We had Diana Vasquez.  Then we

8    had Mr. Carvajal.  And then we had Luz Villegas.  And

9    you are saying that you do not wish to call

10   Mr. Carvajal now during your rebuttal?  Because we are

11   still in your rebuttal.

12             MS. FISHER:  Yes, Your Honor.  I'd like

13   to reserve the right to call him later if needed.

14             THE COURT:  Well, we're not going to back

15   and forth forever.

16             MS. FISHER:  Yes, Your Honor.

17             THE COURT:  So we are in your rebuttal

18   now, and I will consider whether or not I will let you

19   put him on after the rebuttal of the respondent

20   because we cannot just continue to go back and forth

21   and have everyone giving testimony.

22             MS. FISHER:  Absolutely, Your Honor.  The

23   reason I would like to reserve his potential rebuttal

24   testimony is because I don't know what the testimony

25   is going to be from the attorney who might be

1  testifying in Colombia.

2                THE COURT:  Okay.

3                MS. FISHER:  If you would like me to go

4  ahead and put on his mother, Elana Vasquez, I should

5  have just three questions for her based on some

6  testimony that came up in the transcript since the

7  time she testified on February 21.

8                THE COURT:  Okay.  That will be fine.

9                MS. FISHER:  Okay.

10               THE COURT:  But since there is new

11 evidence that will be coming in on rebuttal from the

12 respondent, I will allow you surrebuttal, but only on

13 that new evidence.

14               MS. FISHER:  Absolutely.

15               THE COURT:  Not on whatever the

16 respondent says.

17               Okay.  So let's have your additional

18 rebuttal testimony.

19               MS. FISHER:  Yes, Your Honor.  I'd like

20 to call Elana Vasquez.  Ms. Vasquez, if you're on the

21 phone, if you could please go ahead and unmute.

22               THE COURT:  Ms. Vasquez, are you on the

23 phone?

24               THE WITNESS:  Yes, here I am.

25               THE COURT:  All right.  Let's swear the

1  witness.

2                                **ELANA VASQUEZ**

3  called as a witness, after having been first duly

4  sworn, testified as follows:

5                    THE WITNESS:  I do, and (unintelligible).

6                    THE INTERPRETER:  Would Your Honor like

7  the interpreter to inquire?

8                    THE COURT:  Yes.

9                    THE WITNESS:  I do.  And we are in the

10 greatest week of love and companionship.

11                    THE COURT:  Ask a question, please.

12                **REBUTTAL DIRECT EXAMINATION**

13 BY MS. FISHER:

14      Q.    Ms. Vasquez, did you help care of Thiago

15 when Thiago lived in Colombia?

16      A.    Yes, frequently.

17      Q.    How often did you help take care of

18 Thiago?

19      A.    Every weekend.

20                    THE INTERPRETER:  One moment, Your Honor,

21 the interpreter would like to inquire.

22                    THE WITNESS:  Every weekend.

23 BY MS. FISHER:

24      Q.    To the best of your knowledge do you know

25 if Edison intended to move to the United States

1  permanently?

2        A.    It was never in his plans.

3        Q.    To the best of your knowledge, do you

4  know if Edison consented to Thiago remaining

5  permanently in the United States?

6        A.    He didn't permit it, nor would he.

7              MS. FISHER:  That's all at this time,

8  Your Honor.

9              THE COURT:  Okay, thank you.  Now, we're

10  ready for the rebuttal testimony of the respondent.

11             MS. FISHER:  Mr. Sanderson may want to

12  cross-examine.

13             THE COURT:  Excuse me?

14             MR. SANDERSON:  Yeah, I'd like to ask her

15  just a couple questions.

16             THE COURT:  Oh, I'm sorry.

17             **REBUTTAL CROSS-EXAMINATION**

18  BY MR. SANDERSON:

19        Q.    Hi, Ms. Vasquez.  This is Joel Sanderson,

20  the attorney for Ms. Gamba.

21        A.    Very good day to you.  How are you?

22        Q.    Doing well, thanks.  You testified just

23  now that you cared for Thiago on the weekends.  Where

24  were you and where was Thiago when you were caring for

25  him?

1          A.    At my house.

2          Q.    So on the weekends Thiago was usually

3    over at your house?

4          A.    Normally on weekends -- can I say

5    something else?

6          Q.    I have an additional question,

7    Ms. Vasquez.  So before Ms. Gamba came to the

8    United States, did you know that Ms. Gamba wanted to

9    move to the United States?

10         A.    I got very sad at the moment that I

11    realized that she was abandoning her little child.

12              THE COURT:  That was not the question.

13    Ask the question again.  This is the Judge speaking.

14    BY MR. SANDERSON:

15         Q.    Before Ms. Gamba came to the

16    United States, did you know that she wanted to move to

17    the United States?

18              A.    I was not up to date on her plans.

19              MR. SANDERSON:  No more questions,

20    Your Honor.

21              THE COURT:  Any redirect?

22              MS. FISHER:  No, Your Honor.

23              THE COURT:  All right.  Now we will go

24    to -- thank you, Ms. Vasquez.  Let me ask, is your son

25    with you at the moment?

1          THE WITNESS:  Yes, he's here with me.

2          THE COURT:  Okay.

3          All right.  Mr. Sanderson, we're ready

4     for the respondent's rebuttal.

5          MR. SANDERSON:  Your Honor, the attorney

6     is having trouble connecting to the system.  I can go

7     ahead and put on Ms. Gamba.

8          THE COURT:  Okay.

9                     **PAOLA GAMBA**

10    called as a witness, after having been first duly

11    sworn, testified as follows:

12              **REBUTTAL DIRECT EXAMINATION**

13    BY MR. SANDERSON:

14         Q.   Ms. Gamba, I'm going to first ask you

15    some questions about the abuse that you testified

16    about before.

17         A.   Okay.

18         Q.   Now, before you testified an incident

19    about -- about an incident where Mr. Carvajal used

20    your hands and wrists to choke you around the neck.

21         A.   Yes.

22         Q.   Were there any other incidents where you

23    ended up feeling as though you were being choked

24    around the neck?

25         A.   Yes.

1          Q.     What happened?

2          A.     On his niece's Angela's birthday, he took

3     my child from me, said he was going to take him.  He

4     hit me and since his sister got into it also, he hit

5     her.  He ended up hitting both of us.

6          Q.     And where did that occur?

7          A.     That happened in San Andre when we were

8     celebrating his niece's birthday.

9          Q.     And approximately when did that happen?

10         A.     It happened in April 2016.

11         Q.     And were there any other incidences where

12    you were either choked or hit?

13         A.     Yes.

14         Q.     Can you describe another incident?

15         A.     At my house.

16         Q.     What happened?

17         A.     He arrived drunk looking for sex.  Since

18    I didn't give in, he tried to choke me.

19         Q.     And what happened next?

20         A.     I had to call my parents.

21         Q.     And what did your parents do?

22         A.     They helped me.  They separated me from

23    him.

24         Q.     And are there other incidences that you

25    haven't described here or in your previous testimony?

1        A.      There were many incidents.

2        Q.      Okay.  That's all I'm going to ask about

3   the abuse.  I now am going to ask about Mr. Carvajal's

4   witness, Diana Vasquez.

5        A.      Okay.

6        Q.      When you lived in Colombia, did you ever

7   meet Ms. Vasquez?

8        A.      I saw her once.

9        Q.      And where did you see her?

10       A.      I saw her at a property where I had taken

11  my son for him to meet her.

12       Q.      And was anybody else there?

13       A.      Yes.

14       Q.      And why were they there?

15       A.      They were there because Diana had come

16  from Canada for a visit.  It hadn't been too long.

17  And since she doesn't get to Colombia very much, they

18  like to get the whole family together.

19       Q.      So how many people were there?

20       A.      Oh, I don't know, a lot.  Maybe 40.

21  Lots.

22       Q.      When you lived in Colombia, were you

23  close to Ms. Vasquez?

24       A.      No, because she lives in Canada.  I just

25  saw her the one time.

1      Q.    And did you ever start communicating with

2  her more?

3      A.    Yes.

4      Q.    When was that?

5      A.    When I got to the United States.

6      Q.    And how did you end up communicating with

7  her once you were in the United States?

8            THE INTERPRETER:  May the interpreter ask

9  for a clarification from counsel.  How?

10           MR. SANDERSON:  Yes, not the manner,

11 the -- like what caused you to become --

12           THE INTERPRETER:  Thank you.

13           THE WITNESS:  She got in touch with me

14 because she had been through that whole immigration

15 process, the same as my process.  And he asked --

16 Edison asked her to get in touch with me.

17 BY MR. SANDERSON:

18     Q.    Okay.  And then about -- I want to ask a

19 couple questions about Ana Maria Vasquez.

20     A.    Fine.

21     Q.    When you lived in Colombia, how well did

22 you know her?

23     A.    No, I didn't know her very well.

24           FROM THE PHONE:  Good morning.

25           MR. SANDERSON:  Could you ask her to put

1  it on mute?

2            FROM THE PHONE:  Okay.

3            THE COURT:  What are we hearing in the

4  background?

5            MR. SANDERSON:  I believe she's at work.

6            THE COURT:  Who is at work?

7            MR. SANDERSON:  This is an attorney from

8  Colombia.  She just obtained one document for us.

9            THE COURT:  Okay.  Well, ask her to put

10 her phone on mute at the moment.

11            MR. SANDERSON:  Ms. -- you don't need to

12 respond to this, but to let you know, it's going to be

13 just a few minutes until you are going to testify.

14            THE COURT:  Mr. Sanderson, if your

15 examination of your client is going to be lengthy, we

16 could interrupt it.  We do have -- in the interest of

17 time.

18            MR. SANDERSON:  It's not going to be

19 particularly lengthy.  I don't have that much more,

20 but I -- I suspect that the cross may be a little

21 while, so I'd be happy to just go over this real

22 quick.

23            THE COURT:  Yeah.  Would that be all

24 right with you, Ms. Fisher?

25            MS. FISHER:  Yes, Your Honor, that's

1  fine.

2         THE COURT:  You can stay where you are,

3  Ms. Gamba.  And we're going to interrupt the testimony

4  of the respondent, Ms. Gamba, in order to take this

5  additional witness.  She is in Colombia and she's a

6  lawyer and I'm sure she's very busy.  And so we will

7  go ahead and take her testimony now.  So if you would

8  take your phone off mute, we will swear you in and

9  take your testimony at this time.

10              **LAURA VANESSA OQUENDO RUIZ**

11  called as a witness, after having been first duly

12  sworn, testified as follows:

13              **DIRECT EXAMINATION**

14  BY MR. SANDERSON:

15         Q.   Ms. Oquendo, I just handed the Judge a

16  copy of --

17              THE COURT:  Can we have her full name?  I

18  haven't gotten her name.

19              MR. SANDERSON:  Sorry, Your Honor.  Can

20  you state your name for the Court?

21              THE COURT:  What is her name?

22              THE WITNESS:  Yes, my name is Laura

23  Vanessa Oquendo Ruiz.

24  BY MR. SANDERSON:

25         Q.   And what is your profession?

1          A.      I'm an attorney.

2          Q.      And where are you an attorney?

3          A.      Since the 5th of March of 2018 I'm

4    working in the judicial branch as a scribe.

5                  THE INTERPRETER:  Could be a notary.

6                  THE WITNESS:  In Antioquia.  The Second

7    Judicial District of Antioquia in the criminal trial

8    system.

9    BY MR. SANDERSON:

10         Q.      Ms. Oquendo, you provided a letter to Ms.

11   -- or did you provide a letter to Ms. Gamba about the

12   requirements to obtain the degree of lawyer in

13   Colombia?

14         A.      Yes, I gave her a letter that was given

15   to me by the Autonomous University of Colombia.

16         Q.      And how did you obtain that document?

17                 THE INTERPRETER:  May the interpreter

18   instruct the witness to separate the words more

19   clearly.

20                 THE WITNESS:  I obtained the letter from

21   the University of Latin America -- Autonomous

22   University of Latin America when I requested that they

23   give me all of the requirements for people who wish to

24   become lawyers here.

25

1   BY MR. SANDERSON:

2          Q.    And the -- there are some different

3   dollar amounts on this page.  Are those in Colombian

4   currency or in US dollars?

5          A.    They are Colombian.  They're Colombian

6   prices in pesos.

7          Q.    And did you also provide a letter stating

8   that you are a lawyer for the -- to be included with

9   that document from the university?

10         A.    Yes.  Yes.  Yes, I provided a letter.

11  The letter.

12         Q.    And did you also provide any proof that

13  you are a lawyer?

14         A.    Yes, of course.  I provided my

15  professional card and also a certificate.  A

16  certificate that can be taken out of the website of --

17  that you can get off the website.

18              MR. SANDERSON:  Your Honor, we -- the

19  last certificate was not included in this because we

20  figured that the bar card was enough.

21              THE COURT:  Okay.

22              MR. SANDERSON:  I would move to admit

23  this packet of documents as the next respondent's

24  exhibit.

25              THE COURT:  I think it's 12.  Is that

1    right?

2                    COURTROOM DEPUTY:  It's 12.

3                    THE COURT:  Is there any objection?

4                    MS. FISHER:  No, Your Honor.  I would

5    just like to note on the record that the translation

6    is not through a court-certified interpreter.  We

7    don't object.

8                    THE COURT:  Thank you.  12 is admitted.

9                    (Respondent Exhibit No. 12 was admitted.)

10                    THE COURT:  Ms. Fisher, do you have any

11   cross for this witness?

12                    MS. FISHER:  Yes, Your Honor, briefly.

13                    THE COURT:  Okay.

14                    MR. SANDERSON:  Ms. Oquendo, the attorney

15   for Mr. Carvajal is going to ask you a few questions

16   now.

17                    THE INTERPRETER:  This is the interpreter

18   speaking.  Is it possible for the interpreters to have

19   a copy of the document if we're going to be discussing

20   it?

21                    MR. SANDERSON:  Sure.

22                    **REBUTTAL CROSS-EXAMINATION**

23   BY MS. FISHER:

24        Q.    Ms. Ruiz, my name is Alex Fisher.  Thank

25   you for your time today.

```
1          A.    My pleasure.
2          Q.    Ms. Ruiz, are you related in any way to
3    Ms. Paola Gamba?
4          A.    No, but I've known her for many years.
5          Q.    Are you dating or in a relationship with
6    any of Ms. Gamba's family members?
7          A.    Yes.
8          Q.    Which of her family members?
9          A.    With her brother.
10          Q.    You stated earlier the requirements you
11    have provided to us to obtain an academic degree are
12    from the Autonomous University of Latin America in
13    Colombia; is that correct?
14          A.    Yes.
15          Q.    Is that the university you attended for
16    law school?
17          A.    Yes, I studied at the Latin American
18    University, the Autonomous University of Latin
19    America, and I graduated from there.
20          Q.    Is that a private or a public school?
21          A.    It's private.
22          Q.    Do you know if their requirements differ
23    to obtain an academic degree as a lawyer in Colombia
24    between a private and a public school?
25          A.    Yes.  There are some that are generic
```

 1  requirements for all universities, and there are some
 2  that are particular to the school itself.
 3      Q.    Do you know if Edison Carvajal attended
 4  the Autonomous University of Latin America?
 5      A.    Yes, well, he went there sometimes.  He
 6  took classes there at times.
 7          THE INTERPRETER:  Excuse me.  The
 8  interpreter corrects the record.  I saw him there
 9  sometimes at the university taking classes.
10          MS. FISHER:  I think that's all at this
11  time.  Thank you, Ms. Ruiz.
12          THE COURT:  Any redirect of Ms. Oquendo?
13          MR. SANDERSON:  No, Your Honor.
14          THE COURT:  Ms. Oquendo, thank you.  This
15  is the judge.  Thank you very much.  We're finished
16  with your examination.
17          THE WITNESS:  My pleasure.
18           *****WITNESS EXCUSED*****
19          THE COURT:  Are we in agreement, then,
20  that the school where Mr. Carvajal took all this legal
21  course work is the same school for which we have these
22  documents?
23          MS. FISHER:  Not yet, Your Honor.  I'm
24  confirming that right now.
25          THE COURT:  Okay.  All right.  Now we're

1    going to go back and continue the rebuttal testimony

2    of the respondent.  Mr. Sanderson.

3                    MR. SANDERSON:  Thank you, Your Honor.

4            **CONTINUED REBUTTAL DIRECT EXAMINATION**

5    BY MR. SANDERSON:

6            Q.    Ms. Gamba, they'd asked you how well you

7    knew Ana Maria Vasquez.

8            A.    I didn't know her very well.

9            Q.    And where had you met her?

10           A.    At the shopping center.  When I went with

11   my mom I saw her.

12           Q.    And where was she working?

13           A.    Selling ice creams.

14           Q.    And approximately when was that?

15           A.    When my little boy was maybe two months

16   old.

17           Q.    And did you ever get to know her better?

18           A.    No.  I knew that she was Edison's cousin

19   because Edison had told me that he had a cousin who

20   worked there.

21           Q.    Okay.  Now, I want to ask you about some

22   emails that we've submitted as evidence previously.

23           A.    Okay.

24           Q.    Some of these emails are from 2013 and

25   2014.  How did you end up with those emails?

1        A.    From Mr. Edison's email who opened up his

2 email on my computer and left it open.

3        Q.    And so what did you do?

4        A.    I went through them.

5        Q.    Why is that?

6        A.    I wanted to know what he was hiding.

7        Q.    And those emails from 2013 and 2014 were

8 sent from Mr. Carvajal's account to your account.  How

9 did they end up being sent to your account?

10        THE INTERPRETER:  What was the last part

11 of the question, Counsel?

12 BY MR. SANDERSON:

13        Q.    How did those emails end up being sent

14 from his account to your account?

15        A.    I sent them.

16        Q.    And then so some of the emails that we

17 submitted were from 2016.  How did you end up with

18 those emails?

19        A.    The ones that are from 2016 were sent to

20 me by Ms. Luz Elena Villegas.

21        Q.    Why were they sent to you?

22        A.    She sent them to me to confirm to me that

23 she still had a relationship with Edison.

24        Q.    And why did she want to confirm that she

25 had a relationship with Edison?

1          A.    Because she realized that he was going to

2     make a trip in December.  And so she got annoyed

3     because he told her that he didn't have anything with

4     me.

5               In fact, he said to her that the only

6     thing he was going to do was bring me my son and go

7     back to her.

8          Q.    And when Ms. Villegas testified, she said

9     that Mr. Carvajal didn't work on the weekends so that

10    he could spend time with Thiago.  And so do you recall

11    if Mr. Carvajal ever worked on the weekend?

12         A.    I remember that on weekends Mr. Carvajal

13    would be completely drunk hanging out with his friends

14    out on somebody's property.

15         Q.    And before, during the day, do you know

16    if he was going to work?

17         A.    The official employees only work from

18    Monday through Friday.

19         Q.    So he didn't work on the weekends?

20         A.    He did not work on weekends.

21         Q.    Ms. Gamba, do you know what this document

22    is?

23         A.    Yes.

24         Q.    What is it?

25         A.    It's the house where I've always lived,

1  and here it states that it is the property of my
2  parents.
3      Q.    And how did you obtain this document?
4      A.    These are the taxes that one pays on the
5  home.  And my mom and my stepfather sent it to me.
6  It's in both of their names.
7          MR. SANDERSON:  Your Honor, I'd move to
8  admit this solely for the purpose of demonstrating the
9  parents' ownership or the mother's ownership of the
10 house.
11         THE COURT:  Any objection?
12         MS. FISHER:  No objection, Your Honor.
13 We'd just like to note for the record that this was
14 not translated by an official court-certified
15 interpreter.
16         THE COURT:  Okay, thank you.  It will be
17 received as Exhibit 13.
18         (Respondent Exhibit No. 13 was admitted.)
19 BY MR. SANDERSON:
20     Q.    Ms. Gamba, when Mr. Carvajal left the
21 United States in January 2017, did he leave anything
22 in the United States?
23     A.    Yes.
24     Q.    What did he leave?
25     A.    He left a suitcase with the things that

1    he had come with, his personal things, clothing and

2    shoes with the promise of coming back.

3          Q.    Ms. Gamba, do you recognize this bag?

4          A.    Yes.

5          Q.    What is it?

6          A.    That's Mr. Edison Carvajal's suitcase.

7          Q.    And how do you know that?

8          A.    It's marked that he wrote it down himself

9    the day that he made the trip.

10          Q.    And inside the bag are some clothing.  Do

11    you recognize this clothing?

12          A.    Yes, that's some of Mr. Edison's

13    clothing.

14          Q.    Ms. Gamba, what are these photos?

15          A.    These pictures are Mr. Edison Carvajal

16    wearing that clothing that he left here in the

17    United States.

18          Q.    So in the first photo, is this -- do you

19    think that this is the piece of clothing he's wearing?

20          A.    Yes, he's wearing two jackets because it

21    was very cold, and that's the one he was wearing

22    underneath.

23                THE COURT:  And let the record reflect

24    Mr. Sanderson is holding up a long-sleeved orange

25    hooded sweatshirt.

1  BY MR. SANDERSON:

2       Q.    And in the second photo?

3       A.    In the second picture it shows Mr. Edison

4  on the porch of the home wearing that shirt.

5       Q.    And is that shirt that I'm holding up, do

6  you believe that it's the same as the shirt in the

7  second photo?

8       A.    Yes, it's the same one.

9             THE COURT:  Let the record reflect

10 Mr. Sanderson is holding up a dark red short-sleeved

11 T-shirt with a white design on the front of it.

12 BY MR. SANDERSON:

13      Q.    And the third photo has a photo of

14 Mr. Carvajal with a child on it.  Do you recognize

15 that shirt?

16      A.    With this T-shirt on was when he asked me

17 for forgiveness for his infidelity with Ms. Luz Elena

18 and asked me for a new opportunity for him to be able

19 to start all over again with me and the baby.

20      Q.    And do you believe that the shirt in the

21 third photo is the same as the shirt that I'm holding

22 up now?

23      A.    It's the same one.  He made it.  He

24 brought it and he left it.

25             THE COURT:  Does it have writing on it?

1            THE WITNESS:  Yes.

2            THE COURT:  What does the writing say?

3            THE WITNESS:  It says mommy, give daddy

4    one last chance.  He loves us very much.

5            And effectively I did give him the last

6    chance.  And I ended up waiting for him.

7            MR. SANDERSON:  Your Honor, I'd move to

8    admit the photos of Mr. Carvajal wearing this

9    clothing.

10           THE COURT:  Any objection to the photos?

11           MS. FISHER:  No objection, Your Honor.

12   Would just like to note on the record that there's no

13   time or date stamp on these photos.

14           THE COURT:  Received as Exhibit 14.

15           (Respondent Exhibit No. 14 was admitted.)

16   BY MR. SANDERSON:

17       Q.   Ms. Gamba, I've handed you an email.  Do

18   you recognize this email?

19       A.   Yes.

20       Q.   And what is this email?

21       A.   It's from a representative in Washington

22   of the Colombian embassy.

23       Q.   Is it -- it's from the -- somebody in

24   Washington or it's to somebody in Washington?

25       A.   I'm sending it to this gentleman who is a

1   representative of the embassy in Washington.

2       Q.    And previously an email with Mr. Okun was

3   admitted in this case.  Is this a different email?

4       A.    It's the same one.

5       Q.    It's the same email that we submitted

6   previously?

7       A.    I don't remember, but it's the only one

8   I've sent.

9           MS. FISHER:  Respondent's Exhibit 8, I

10  believe.

11          THE COURT:  You're talking about

12  Exhibit 8; right?

13          MR. SANDERSON:  Yes, Your Honor.

14          THE WITNESS:  Oh, yes, I'm sorry.  It's

15  the reply to those emails.  I see.

16  BY MR. SANDERSON:

17      Q.    And how did you end up -- why did you end

18  up sending these emails?

19      A.    I sent these emails so we would come to a

20  conciliatory agreement with Edison about him being

21  able to see his son, which he rejected because he said

22  that what he wants is for me to go back to Colombia.

23          MR. SANDERSON:  Your Honor, I'd move to

24  admit this as Respondent Exhibit 15.

25          THE COURT:  Any objection?

1              MS. FISHER:  None at this time,

2    Your Honor.

3              THE COURT:  All right.  Received.

4              MS. FISHER:  I'd just like to note for

5    the record that the translation is not by a certified

6    court interpreter.

7              THE COURT:  Okay.

8              (Respondent Exhibit No. 15 was admitted.)

9    BY MR. SANDERSON:

10         Q.    Ms. Gamba, when Thiago spent his first

11   five months here up until January 2017, did he like it

12   here?

13         A.    Yes.  He loves being here.

14         Q.    And when he first got here in August of

15   2016, did he speak at all?

16         A.    No, he didn't talk at all.  He just said

17   mama.

18         Q.    And when Mr. Carvajal visited

19   in December 2016 to January of 2017, did Thiago speak

20   at all then?

21         A.    Yes.  Yes, he was already talking.

22         Q.    And what language did he speak?

23         A.    In English.

24         Q.    And during his time here, did Thiago

25   know -- get to know any of his family other than

1    Mr. and Mrs. Chambers?

2         A.    Yes.

3         Q.    Who else has he spent time with?

4         A.    David's father -- parents.  David's

5    parents.  And my son calls them his grandpas.  He says

6    granny and grandpa.

7         Q.    And who does he call granny and grandpa?

8    Can you clarify?

9         A.    David's parents.

10        Q.    And has he met any of the other -- any

11   other family members in the United States?

12        A.    Yes.

13        Q.    And who else has he met?

14        A.    David has some daughters and they have

15   sons.  And, in fact, even last Sunday we were together

16   with them in a family reunion at a birthday.

17             MR. SANDERSON:  The interpreter -- I

18   believe she said has brothers and sisters.

19   BY MR. SANDERSON:

20        Q.    Ms. Gamba, does David have -- were you

21   talking about David's brothers and sisters or were you

22   talking about his children just now?

23        A.    All together.

24        Q.    But just now when you were talking, were

25   you talking about brothers --

1       A.   David has two brothers.  They're married.

2   They have daughters.  And those daughters have

3   children.  So we all got together like a family to

4   share time together.

5       Q.   And how often do you see them?

6       A.   A lot.  Just last Sunday we were all

7   together.

8       Q.   And how often does he see his

9   grandparents?  Or David's parents, excuse me.

10      A.   Every day.

11      Q.   He sees David's parents every day?

12      A.   Every day.

13      Q.   Where do they live?

14      A.   Right across the street from us.

15      Q.   When did you first tell Mr. Carvajal that

16   you wanted to come to the United States to live here?

17      A.   I told him that I wanted to come here the

18   first time that I realized that he had a visa, and I

19   complained to him, why hadn't he included me.

20      Q.   And approximately when was that?

21      A.   I'm not sure.  It was when Thiago was

22   very young.  I think maybe in 2014 or 2015, probably.

23      Q.   And once you were in the United States,

24   did you and Mr. Carvajal discuss where Thiago was

25   going to live?

1      A.    Yes.

2      Q.    And what did you guys talk about?

3      A.    That he wanted the child to live here.

4      Q.    Why did he want the child to live here?

5      A.    Because it was so much better than

6  Colombia, education, the care and my child here, he

7  can go out, he can run around.  He's spending time

8  with the family.

9      Q.    And when Thiago was still in Colombia,

10 did he spend a lot of time at Mr. Carvajal's parents'

11 house?

12     A.    No.

13     Q.    How often did he go over there?

14     A.    Sometimes Edison would go to my house and

15 ask me if I would let the child go -- if he could take

16 the child with him.  But he wouldn't be gone even a

17 half hour because he would say that the baby was

18 crying.  And the baby cried because he didn't know

19 them.

20     Q.    And did you go with Thiago and

21 Mr. Carvajal to his parents' house?

22     A.    Never.

23     Q.    Why not?

24     A.    Ms. Elana Socorro, his mother, had

25 prohibited me from getting near their house.

1      Q.    Why did she do that?

2      A.    Because, according to her, I don't have

3   enough studies completed to be near her son.

4      Q.    And since he's been in the United States,

5   who has taken -- since Thiago has been in the

6   United States, who's primarily taken care of him?

7      A.    When I go to work, he stays with my

8   sister and with David.

9      Q.    And when you're not at work?

10      A.    Me.

11      Q.    And does he live with you?

12      A.    Yes, I get out of work at 1 o'clock and

13   he spends the whole afternoon with me.

14          MR. SANDERSON:  No more questions,

15   Your Honor.

16          THE COURT:  Cross?  Yes, Your Honor.

17          **REBUTTAL CROSS-EXAMINATION**

18   BY MS. FISHER:

19      Q.    Good afternoon -- or good morning,

20   Ms. Gamba.

21          MS. FISHER:  Your Honor, for the Court's

22   record, we have certified interpretations of

23   defendant's Exhibit 9 and 11, which I provided to

24   defendant's counsel.  If I could move these into

25   evidence at this time, Your Honor.

1                    THE COURT:  These are the two exhibits

2    that contain emails between Mr. Carvajal and Ms. Luz?

3                    MS. FISHER:  Yes, Your Honor.

4                    THE COURT:  Okay.  Any objection?

5                    MR. SANDERSON:  No objection, Your Honor.

6                    THE COURT:  All right.  So those would

7    be, what, 16, collective 16?

8                    MS. FISHER:  Plaintiff's 16.  We can just

9    make them a collective exhibit, Your Honor, if that's

10   acceptable.

11                   THE COURT:  That's fine.

12                   (Petitioner Exhibit No. 16 was admitted.)

13                   THE INTERPRETER:  May the interpreters

14   have copies if we're going to be having questions

15   about them?

16                   MS. FISHER:  Yes.

17   BY MS. FISHER:

18       Q.    Ms. Gamba, I'd like to hand you at this

19   time several documents that happen to be screenshots

20   of What's App conversations between you and Ms. Diana

21   Vasquez.  Ms. Gamba, do these appear to be What's App

22   messages between yourself and Ms. Diana Vasquez

23   between approximately December 2017 and March 2018?

24       A.    Yes.

25                   MS. FISHER:  Your Honor, at this time I'd

1  like to move these into evidence as Petitioner's

2  Exhibit 17.

3            THE COURT:  Any objection?

4            MR. SANDERSON:  I haven't checked, given

5  that the second one seems to have no context and --

6  oh, they're just out of order a little?

7            MS. FISHER:  These are in the order that

8  they were provided.  So the English translation is in

9  the same order as the Spanish screenshots that are

10  provided directly behind them.

11            MR. SANDERSON:  No objections,

12  Your Honor.

13            THE COURT:  All right.  Received as

14  Exhibit 17.

15            (Petitioner Exhibit No. 17 was admitted.)

16  BY MS. FISHER:

17       Q.   Ms. Gamba, you are using an interpreter

18  here in court today; correct?

19       A.   Not literally.  I mean, I understand.

20       Q.   So why are you using an interpreter in

21  court, then?

22       A.   There are some words that one doesn't

23  know.  In fact, legal ones, because, I mean, I don't

24  have anything to do with the law.

25       Q.   And that's because you're a native

1    Spanish speaker; is that correct?

2        A.    Yes.

3        Q.    And you testified here today that you are

4   the primary caregiver for your son Thiago since you've

5   lived in the United States; is that right?

6        A.    I said my sister because I work.

7        Q.    So Thiago spends most of his time with

8   you or your sister; is that fair?

9        A.    And with David.

10       Q.    And your sister is also a native Spanish

11   speaker; is that right?

12       A.    Yes.  She speaks English and Spanish.

13       Q.    You and your sister mostly speak Spanish

14   when the two of you are talking to one another; right?

15       A.    We do, yes.  Between her and me?  Yes.

16       Q.    So it's fair to say that Thiago at least

17   understands Spanish if he's spending most of his time

18   with you or your sister Kelly?

19       A.    My sister at her home speaks English

20   because David does not speak Spanish.  And I speak

21   English with my son because there are words that he

22   doesn't understand.

23       Q.    The question was whether or not Thiago

24   understands Spanish if he spends most of his time with

25   you and your sister.  Is it fair to say that Thiago

1  understands some Spanish?

2      A.    The truth is I don't know.  I speak with

3  him in English.  The fact is my mom who speaks with

4  him through video calls is doing English classes

5  because she speaks Spanish he doesn't understand.

6           THE INTERPRETER:  He does not understand

7  her.

8  BY MS. FISHER:

9      Q.    Okay.  I have some questions for you

10  about your communications with Luz Villegas.

11      A.    Go ahead.

12      Q.    Ms. Villegas testified to this Court in

13  her affidavit that you contacted her in 2016 and

14  threatened her; is that correct?

15      A.    That's not correct.  I've never contacted

16  her.  She contacted me.

17      Q.    So there is an email that Ms. Villegas

18  provided to the Court that is from you to her dated

19  February 21, 2018, 11:26 a.m.  Did you not send an

20  email to Ms. Villegas on February 21?

21      A.    That is true, I was responding to an

22  email that she sent me in December.  That's how I had

23  her information.  And I -- none of it am I threatening

24  her.

25      Q.    Okay.  I just asked if you sent her an

1  email.

2  　　　　　MS. FISHER:  Could we please pass the

3  witness Defendant's Exhibit 15.  Do you have that?

4  Which should be the affidavit of Luz Elena Villegas

5  and its attachments.

6  　　　　　THE COURT:  Defense Exhibit 15?  That's

7  the letter she sent to David Okun.

8  　　　　　MS. FISHER:  Sorry, petitioner's

9  Exhibit 15.  My apologies, Your Honor.

10  BY MS. FISHER:

11  　　　Q.　　Ms. Gamba, could you please turn to what

12  will be the very last page is the version in Spanish

13  of the email from you to Luz Villegas?

14  　　　A.　　Yes.

15  　　　Q.　　If you'll look down to the third

16  paragraph of the email, you write to Ms. Villegas, I

17  know that what I'm asking you for is not easy, but for

18  my child --

19  　　　　　THE INTERPRETER:  One moment, please,

20  Counsel.  I know it's not easy for you -- I'm sorry,

21  the interpreter needs you to repeat.

22  　　　　　MS. FISHER:  Not a problem.  My

23  apologies.

24  BY MS. FISHER:

25  　　　Q.　　I know that what I am asking you for is

1    not easy, but for my child I am really willing to do

2    whatever it takes.  Is that an accurate statement?

3         A.    Yes, I know it's difficult for her

4    because I know that she had a relationship with

5    Edison.  When I talked to her in 2016 she swore to me

6    on her mother's grave that if I needed anything for me

7    to tell her.

8         Q.    Ms. Gamba, I have a few more questions

9    for you.  Okay?

10        A.    Okay.

11        Q.    Your attorney earlier introduced a piece

12   of evidence to you related to property taxes your

13   parents paid.

14        A.    That's not true -- well, that's not true,

15   we don't have --

16             THE INTERPRETER:  May the interpreter

17   make an inquiry as to the word f-i-n-c-a in Spanish.

18   We may have different dialects of Spanish and it's

19   used differently.

20             THE COURT:  Okay.

21             THE INTERPRETER:  The interpreter would

22   like to correct the record.

23             THE WITNESS:  That's not true, we don't

24   have a country home.  The property, we don't have a

25   country property.

BY MS. FISHER:

    Q.    That was not the question.  The question
was whether your attorney introduced to you earlier
Respondent's Exhibit 13, which is evidence of property
taxes your parents paid on their home.

    A.    Yes.

    Q.    If your parents own their home and
someone pays them rent, they still owe the property
taxes on the home they own; correct?

    A.    Yes.

    Q.    You were asked several questions earlier
about David Chambers, your sister's husband; correct?

    A.    Yes.

    Q.    And David Chambers, his extended family,
is not related to Thiago; right?

    A.    They're not blood relatives, but he loves
them very much.

    Q.    It's fair to say that Thiago has more
people who are blood relatives in Colombia than he
does here in the United States; right?

    A.    The blood relationship doesn't make any
difference if one doesn't love the person.

    Q.    That was not the question.  The question
was is it fair to say that Thiago has more blood
relatives in Colombia than he does here in the

1    United States?

2         A.    Yes.

3         Q.    Ms. Gamba, you have previously stated

4    that you intend to file an application for political

5    asylum so you can remain in the United States; is that

6    right?

7         A.    Yes.

8         Q.    If you know, are you seeking political

9    asylum in the United States based on your race?

10        A.    No.

11        Q.    If you know, are you seeking political

12   asylum based on your religion?

13        A.    No.

14        Q.    If you know, are you seeking political

15   asylum based on your nationality?

16        A.    No.

17        Q.    If you know, are you seeking asylum based

18   on your political opinions?

19        A.    No.

20        Q.    If you know, you're seeking asylum based

21   on your membership in a particular social group?

22        A.    No, I don't know.

23              MS. FISHER:  That's all at this time,

24   Your Honor.

25              THE COURT:  Any redirect?

1          MR. SANDERSON:  Yes, Your Honor.

2                **REBUTTAL REDIRECT EXAMINATION**

3    BY MR. SANDERSON:

4          Q.    Ms. Gamba, are you an attorney?

5          A.    No.

6          Q.    Are you an expert in US law?

7          A.    No.  That's what I had just said a few

8    minutes ago.  I don't know anything about that.

9          Q.    And are you an expert in asylum law, in

10   particular?

11         A.    No.

12         Q.    Do you understand how an immigration

13   court case goes from the very beginning of court to a

14   final decision?

15         A.    No.

16         Q.    Do you have an attorney for your

17   immigration court case?

18         A.    Yes.

19         Q.    Why do you have an attorney?

20         A.    Because I don't know.

21         Q.    Ms. Gamba, I would like to return to that

22   email that you sent Ms. Luz Villegas for a moment.

23   Okay?

24              THE COURT:  What exhibit is that?  Is it

25   11?  Your 11 or 9?

1          MR. SANDERSON:  It's hers.

2          THE COURT:  Is it plaintiff's

3   collective 16?

4          MR. SANDERSON:  I believe it's 15, the

5   affidavit of --

6          THE COURT:  The affidavit of Luz

7   Villegas?

8          MR. SANDERSON:  Yes.

9          THE COURT:  That's plaintiff's 15,

10  petitioner's 15.  Does she have it?  Do you want to

11  ask her questions about it?

12          MR. SANDERSON:  Yes, I believe --

13  BY MR. SANDERSON:

14      Q.    Do you still have that in front of you?

15      A.    Yes.

16      Q.    And in that email in the -- it's the

17  second paragraph that begins speaking about your

18  cousin Daniel.  You appear to be asking Ms. Villegas

19  for something.  Do you recollect what you -- or can

20  you tell me what you were asking her?

21      A.    Yes.

22      Q.    What were you asking for?

23      A.    I'm -- it says here I'm writing you from

24  mother to mother to ask you for all -- bottom of my

25  heart to help me by sending me a letter that will say

1    that if you had or do have a relationship with Edison,

2    if you know his mom and his family, because they're

3    here and they are saying that they don't know you.

4         Q.    And then what did you ask her about the

5    weekends?

6         A.    He alleges that he was spending every

7    weekend with Thiago when the truth is that many of

8    them he was spending with you.

9              THE INTERPRETER:  Interpreter needs to

10   make a clarification.

11             THE WITNESS:  And that both of you, many

12   times, went off together on weekends.

13   BY MR. SANDERSON:

14        Q.    And were you asking her to tell the

15   truth?

16        A.    Yes.

17        Q.    And why were you asking her to tell the

18   truth?

19        A.    Well, because they were lying and that I

20   know that she could tell the truth.

21             MR. SANDERSON:  No more questions,

22   Your Honor.

23             THE COURT:  Any recross?

24             MS. FISHER:  Very brief, Your Honor.

25

1                  **REBUTTAL RECROSS-EXAMINATION**

2     BY MS. FISHER:

3          Q.    Ms. Gamba, we're still looking at

4     petitioner's Exhibit 15, this email dated February 21,

5     2018, from you to Ms. Villegas.

6          A.    Okay.

7          Q.    In the first sentence of the second

8     paragraph --

9          A.    Yes.

10         Q.    -- you wrote you've already met another

11    person?

12         A.    Yes.

13         Q.    Are you currently dating someone?

14         A.    Yes.

15         Q.    And how long have you been in that

16    relationship?

17         A.    Ten months.

18         Q.    And is that person a US citizen?

19         A.    Yes.

20         Q.    And how did you meet them?

21         A.    A girlfriend of mine introduced us.

22         Q.    A girlfriend of yours who lives here in

23    the United States?

24         A.    Yes.

25         Q.    Ms. Gamba, do you need an attorney to

1   tell you if you're being persecuted based on your

2   race?

3          A.    No.

4                 MS. FISHER:  That's all, Your Honor.

5                 THE COURT:  Anything else?

6                 MR. SANDERSON:  One question, Your Honor.

7                 **REBUTTAL REDIRECT EXAMINATION**

8   BY MR. SANDERSON:

9          Q.    Ms. Gamba, can you tell me under US

10  asylum law what a particular social group is?

11         A.    No, I don't know what that is.

12                MR. SANDERSON:  No more questions,

13  Your Honor.

14                MS. FISHER:  No recross, Your Honor.

15                THE COURT:  Ms. Gamba, you must have some

16  sense of how you are applying for political asylum.

17                THE WITNESS:  Initially I was going to

18  ask for political asylum with Edison.  And he's the

19  one who's involved in all of the criminal law and

20  information.  I'm here already and he didn't want to

21  do this with me.  So through my attorney we're going

22  to do it for domestic violence that he caused me.

23                THE COURT:  When you were going to apply

24  for political asylum with Edison, what was the basis

25  for that?  What did you talk about?

 1                    THE WITNESS:  He told me that Ms. Luz
 2      Elena's husband was a corrupt attorney, and because of
 3      the fact that he had had that relationship with her,
 4      they were going to kill the whole bunch of us.
 5                    THE COURT:  And was this -- when you say
 6      they, you mean Luz's husband had a gang or a group of
 7      people that were going to do this killing?
 8                    THE WITNESS:  Edison referred to him to
 9      Luz's husband as the head of a group of delinquents
10      called La oficina, the office.
11                    THE COURT:  You mean criminals.  Not
12      delinquents, but criminals?
13                    THE WITNESS:  Criminals.
14                    THE COURT:  So the plan was that you and
15      Edison would claim political asylum?
16                    THE WITNESS:  Yes.
17                    THE COURT:  Because this group,
18      La oficina, had plans to kill you and Edison and your
19      child because of the affair?
20                    THE WITNESS:  Yes.
21                    THE COURT:  Okay.  But now your
22      application for political asylum is based upon
23      domestic violence against you by Edison?
24                    THE WITNESS:  Yes.
25                    THE COURT:  Anything else?

1                MS. FISHER:  I have a brief recross,

2     Your Honor.

3                THE COURT:  All right, go ahead.

4                MS. FISHER:  Thank you.

5                **REBUTTAL RECROSS-EXAMINATION**

6     BY MS. FISHER:

7          Q.    Ms. Gamba, why do you think Edison

8     remained in Colombia if he is in such danger?

9          A.    I think that he is -- he was laying a

10    trap for me.

11         Q.    How do you think he has escaped harm for

12    over a year in Colombia?

13         A.    I don't know, really.  I don't.

14               MS. FISHER:  That's all.  Thank you.

15               THE COURT:  Was this plan to claim

16    political asylum based on this La oficina, was this a

17    real threat, do you think, or is this just something

18    you and Edison were going to claim was a threat?

19               THE WITNESS:  No, it's something real.

20    And I didn't say that Ms. Luz Elena called me in

21    December of 2014 when my son was two months old.  She

22    said -- she's married and she said, my husband's a

23    very dangerous person and I'm going to have him kill

24    you and your child.  I really got scared.  And Edison

25    was even more so than I was, so much so that he went

1  and hid out for two months.

2          THE COURT:  Okay.  You may step down.

3          THE WITNESS:  I can go?

4          THE COURT:  Yes.

5          THE WITNESS:  Thank you (in English.)

6           *****WITNESS EXCUSED*****

7          THE COURT:  All right.  Any more rebuttal

8  from the respondent?

9          MR. SANDERSON:  No, Your Honor.

10         THE COURT:  Any surrebuttal?

11         MS. FISHER:  Yes, Your Honor.  Mr. Edison

12 Carvajal.

13         THE COURT:  Mr. Carvajal, you're still

14 under oath from earlier today.  Are you there?

15         THE WITNESS:  Yes, I'm here.

16         **SURREBUTTAL DIRECT EXAMINATION**

17 BY MS. FISHER:

18     Q.   Mr. Carvajal, have you had a chance to

19 look at what has been introduced today as the

20 administrative requirements to obtain an academic

21 title?

22     A.   Yes, I know them.

23         MS. FISHER:  Your Honor, for the

24 interpreter, could we please hand the interpreter what

25 is Respondent's Exhibit 12.

1    BY MS. FISHER:

2         Q.    Mr. Carvajal, what university did you

3    attend for your law school?

4         A.    The Autonomous University of Latin

5    America.

6         Q.    And Mr. Carvajal, have you had a chance

7    to look at the Spanish version of the requirements to

8    obtain an academic degree that are purportedly for

9    your university?

10        A.    I know that document very well, so I

11   haven't had to review it.

12        Q.    Okay.  Mr. Carvajal, have you completed

13   your plan of study?

14        A.    Yes, I finished all my studies.  The only

15   thing that's left to do is to finish with the

16   graduation ceremony and all of the official

17   administrative processes that have to be undergone.

18        Q.    Okay.  Mr. Carvajal, did you -- I'm going

19   to ask you a different question now.  Did you leave

20   behind some items of clothing accidentally when you

21   traveled back to Colombia from the US?

22             THE INTERPRETER:  I couldn't hear.

23   BY MS. FISHER:

24        Q.    Please repeat.

25        A.    Yes, and I'll explain why I left them.  I

1    left them there because Paola's sister Kelly wanted to

2    send some presents back to the family in Colombia.

3    And the suitcase that I had taken with me when I

4    traveled -- because I never did intend to stay -- was

5    a very small -- it was a very small suitcase, only

6    enough for personal items.

7         Q.    Mr. --

8         A.    So Kelly told me that she wanted me to

9    take some presents for her family members.  And it's

10   quite numerous, her family.  There's four people, and

11   so that I could leave some other things behind in

12   order to fit those in.

13        Q.    Mr. Carvajal, did you --

14        A.    And that I could take a suitcase that she

15   had that was bigger so that all the family's gifts

16   would fit in it.  That's the reason why I left --

17   that's the reason why I left some of my own items

18   behind.

19        Q.    Mr. Carvajal, did Ms. Luz Villegas's

20   husband ever threaten you or Ms. Gamba?

21        A.    Never.  That never happened.

22             MS. FISHER:  That's all at this time,

23   Your Honor.

24             THE COURT:  Any cross?

25

1            **SURREBUTTAL CROSS-EXAMINATION**

2    BY MR. SANDERSON:

3        Q.    Mr. Carvajal, this is Joel Sanderson, the

4    attorney for Ms. Gamba.  I just have a few questions.

5        A.    Hello, sir.  How are you?

6        Q.    I'm doing well.  So I want to ask you

7    about what you said about Paola's sister Kelly.

8        A.    Okay, of course.

9        Q.    Were you planning on getting the clothing

10   that you left in the United States back?

11       A.    No, she told me that she would bring it

12   to me when she brought my son to me.

13       Q.    And with regard to Luz Elena Villegas,

14   did you ever have a romantic or sexual relationship

15   with Ms. Villegas?

16       A.    Well --

17            THE INTERPRETER:  The interpreter wishes

18   to say that the first part of the sentence is missing,

19   so she's going to inquire about that, but in the

20   meanwhile she'll say what was the second part before

21   she forgets it.

22            THE WITNESS:  But it didn't work out and

23   that was in 2013, and that was before my son was born.

24            Yes, of course, I'll repeat it.  In 2013

25   I went out with her a few times.  And when things

1    didn't work out between us, we remained good friends.
2    She already had her family.  And that was before my
3    son Thiago was born.
4    BY MR. SANDERSON:
5         Q.   Mr. Carvajal, previously when you
6    testified you had said that, no, you'd never had any
7    sort of relationship like that with Ms. Villegas.
8    Isn't that right?
9         A.   No, I'm clarifying.  I haven't had -- I
10   haven't had a -- I haven't had -- I haven't had a
11   relationship with her in the sense that I only went
12   out with her a couple of times.  I wouldn't exactly
13   call that a relationship's because there wasn't really
14   a relationship.  We just went out to eat and to have
15   something to drink.  We tried to get to know one
16   another.  But things didn't work.
17             THE COURT:  Ask another question.  The
18   transcript will reveal what he said the first time
19   around.
20             MR. SANDERSON:  I have no more questions,
21   Your Honor.
22             THE COURT:  Mr. Carvajal, this is the
23   judge.  Did you ever have a conversation with Paola
24   where you discussed seeking political asylum in the
25   United States together?

1          THE WITNESS:  That's false -- Your Honor,
2     that is false.
3          THE COURT:  Did you ever have a
4     conversation with Paola about her and Thiago seeking
5     political asylum in the United States?
6          THE WITNESS:  Your Honor, that is untrue,
7     and I never did that, Your Honor.
8          THE COURT:  Mr. Carvajal, what is
9     La oficina?
10          THE WITNESS:  To tell you the truth, I
11     don't really know what Ms. Paola is referring to when
12     she uses that term.  I'm -- I do not know about that.
13          THE COURT:  Do you know if Ms. Luz's
14     husband is a member of any kind of a group or gang?
15          THE WITNESS:  That's untrue because I've
16     been work -- a coworker with Luz Villegas.  She tells
17     me that her husband is a lawyer.
18          THE INTERPRETER:  The interpreter thinks
19     we've gotten cut off.
20          THE COURT:  Are you still there,
21     Mr. Carvajal?  Mr. Carvajal, are you still on the
22     phone?
23          Are you in touch with him, Ms. Fisher?
24          MS. FISHER:  I just messaged him,
25     Your Honor.  It looks like there's still one person

1   logged in on the call.  Usually it makes a little beep

2   if it drops off.  If you'll give me 20 seconds, I'll

3   confirm if he's still on.

4                   THE COURT:  Okay.

5                   Mr. Carvajal, are you on the phone?

6                   THE WITNESS:  I'm here.

7                   THE COURT:  Okay.  You were saying that

8   Ms. Luz told you that her husband was a lawyer, and

9   then you were cut off.  So can you finish your answer?

10                  THE WITNESS:  Of course, with pleasure.

11  I was saying to you, Your Honor, and to the Court that

12  Luz Villegas told me that her husband is an attorney

13  and she also is an attorney, and at this point in time

14  he is in public office.  He teaches classes at the

15  university.  That's what she told me.  I have no

16  personal knowledge of this because I'm not in touch

17  with him.

18                  THE COURT:  Okay, thank you.  All right.

19  I think we're finished -- we're finished with

20  testimony.  Is there any other surrebuttal from the

21  petitioner?

22                  MS. FISHER:  Nothing further, Your Honor.

23                  THE COURT:  Any surrebuttal from the

24  respondent?

25                  MR. SANDERSON:  No, Your Honor.

1          THE COURT:  All right.  Would you like to
2   make closing arguments?
3          MS. FISHER:  Yes, Your Honor.
4          THE COURT:  We're going to take a
5   15-minute recess and we'll come back for closing
6   arguments.
7          (Whereupon, a break was taken from
8   11:35 a.m. to 11:53 a.m.)
9          THE COURT:  All right.  I'm ready for
10  argument, Ms. Fisher.
11         MS. FISHER:  Thank you, Your Honor, for
12  the time and attention you've given to this case.
13         THE COURT:  Well, thank you.  Because I
14  know you're probably doing this pro bono, am I right?
15         MS. FISHER:  Yes, Your Honor.
16         Just briefly, in closing, as you've heard
17  over the past few days, Mr. Carvajal never consented
18  to the retention of his son permanently in the
19  United States.  His decision to trust that
20  Ms. Chambers would return Thiago to Colombia was not
21  consent.  It was simply his decision to trust
22  Ms. Chambers.
23         Your Honor, I'd like to bring your
24  attention to a case which I provided a copy of to
25  opposing counsel for some guidance in this matter.

1  *Koc versus Koc*, I believe.  K-o-c versus K-o-c.  And I
2  have a copy for Your Honor today.
3            THE COURT:  What circuit is it?
4            MS. FISHER:  Eastern District of
5  New York.
6            THE COURT:  Okay.  2001.
7            MS. FISHER:  Yes, Your Honor.  And this
8  case establishes several factors to look at to
9  determine if a child is well-settled in the new
10 country that they've been brought to.  And I think it
11 provides some relevance for us here today.
12           It looks to the child's age, the
13 stability of residence in their new environment, and
14 in particular when looking at stability, the Court
15 looks on page 154 to the immigration status of the
16 child and the immigration status of the child's
17 parents in the new country as to whether or not that's
18 certain or uncertain.
19           THE COURT:  Now, this child was seven
20 years old.
21           MS. FISHER:  Yes, Your Honor.  And this
22 case the child had been retained in the United States
23 for a two and a half years.
24           This court also looks to whether or not
25 the child is attending school, which Thiago is not.

 1    Looks to whether they're attending church or religious

 2    services, which we've heard no testimony to; the

 3    stability of the abducting parent's employment; and

 4    whether they have friend or relatives in the area.

 5                In looking at these sort of comprehensive

 6    factors that the Koc court looked at in 2001, none of

 7    those have been established in this case.  So we know

 8    Mr. Carvajal did not consent for his son Thiago to be

 9    here, and he has not proved that he is well-settled

10    under the case law in prior cases similar to this.

11                As Your Honor well knows, this is not a

12    domestic case in state court.  This is a case about

13    which jurisdiction is the appropriate venue to

14    determine questions about the division of custody

15    between Thiago's parents.

16                So I'd just like to be very clear on the

17    record that Mr. Carvajal is not attempting to, nor

18    does he wish to separate Thiago from Thiago's mother.

19    Rather, the purpose of the Hague Convention and its

20    application and situation such as these, and

21    specifically the purpose of Mr. Carvajal's petition

22    under the Hague Convention, is to ensure that Thiago

23    has the opportunity to have a relationship with both

24    his mother and father.

25                That if he is to change his residence to

1  a different country, that it is with the consent of

2  both parents, not a unilateral decision by one parent.

3            Just logistically, Your Honor, so you

4  know regarding the priority of Thiago in this case,

5  our office has been in touch with the US Central

6  Authority to coordinate a safe return protocol with

7  the US Department of State if Your Honor determines

8  that Thiago is to return to Colombia.

9            We've also retained a psychologist,

10 Debora DeSwano, to assist Thiago in this transition.

11 And Your Honor, she was an individual present in the

12 court at the first two hearings.

13            THE COURT:  Yes.

14            MS. FISHER:  Thiago has a valid passport,

15 which is in this Court's possession.  Mr. Carvajal has

16 a valid tourism visa that will permit him to return to

17 the United States to escort Thiago home.

18            Currently, Your Honor, the civil courts

19 are closed in Colombia between Palm Sunday and Easter,

20 and he is widely available until April 1, and beyond

21 April 1 he is still available to return and can

22 coordinate with family to ensure that, again, if

23 Your Honor chooses -- or determines that Thiago is to

24 appropriately return to Colombia, we've made every

25 effort to make sure that that transition is in

1    Thiago's best interest and to facilitate it for him.

2              Just in conclusion, Your Honor, this case

3    is about a minor child, that he deserves the

4    opportunity to grow up having a relationship with both

5    parents.  He is very fortunate, unlike many children,

6    that he has a mother and a father who desperately want

7    to have a relationship with him.  We simply request

8    that Your Honor, in looking at the Hague Convention

9    guidelines, permit that to happen.  Thank you.

10             THE COURT:  Thank you, Ms. Fisher.

11             Mr. Sanderson.

12             MR. SANDERSON:  Thank you, Your Honor.

13             Your Honor, this is not a Hague

14   Convention case because Thiago's habitual residence is

15   the United States, and the petitioner has not

16   established by the preponderance of evidence the

17   prima facie case that habitual residence is Colombia

18   and that is his burden.

19             Now, it may be that the petitioner

20   regrets some of his decisions and actions and regrets

21   initially intending for the US to be Thiago's home.

22   But this Court isn't here to fix those problems.

23             Now, there are two tests for habitual

24   residence which seem like they can be used separately

25   and in conjunction, the acclimatization test and the

1    settled mutual intent.

2              Now, under either one the respondent has

3    demonstrated, though it's not her initial burden, but

4    has demonstrated that the preponderance of the

5    evidence establishes that the habitual residence is

6    the United States.

7              Now, Mr. Carvajal did intend from

8    sometime around at least July 2016 until sometime

9    around February 2017, for Thiago's home to become the

10   United States.  And in addition to petitioner's other

11   burden, one of them is to establish the actual date

12   and time period of wrongful retention, and so far it's

13   unclear whether it's early February, mid February,

14   March, like where that line actually is.

15             But the question for habitual residence

16   does -- is based on the habitual residence at the time

17   of whenever that retention was.

18             Now, the evidence in this case is

19   consistent with Ms. Gamba's testimony and the evidence

20   that she has presented.  In addition, her version of

21   events is also consistent with the evidence submitted

22   by the petitioner.

23             I would direct the Court, for example, to

24   the emails that she sent to the Department of State.

25   They are basically the exact same thing that she

testified to in court.  She's not had a different
story; whereas, Mr. Carvajal has had different
stories.  And his credibility is greatly diminished by
the numerous inconsistencies within his own story, as
well as the inconsistency between him and basically
all of his witnesses, from Diana Vasquez stating that
everyone knew that Ms. Gamba wanted to move to the
United States, and Ana Maria Vasquez testifying that
Thiago slept half of every week at the Carvajal's
house.

Then the Western Union money orders and
the clothes he left in the United States and the
emails with Luz Villegas, all of these demonstrate
that he has not been presenting an honest and true
version of the facts; whereas, the Western Union, the
clothes and the other evidence and the fact that there
was no flight purchased for Thiago to fly back in
January.

So Mr. Carvajal, who did not have the 200
or so dollars necessary to graduate, was planning to
buy a last-minute ticket around the holiday season for
Thiago to return, changed his mind and then was going
to buy a last-minute ticket in February for him to
return.

That argument just doesn't hold water,

1   and it isn't consistent with the facts of this case.

2   Moreover, Thiago is and was acclimatized to the

3   United States.  His family was here, he was

4   comfortable here.  He had been spending all of his

5   time at home here.  And to him, at that point in his

6   life at just over two years old, you know, his home

7   was where his mother was.  She was the person who

8   cared for him.

9           Additionally, he learned to speak English

10  as his primary language and was already learning it

11  when Mr. Carvajal visited in December 2016.  This

12  shows that under either the settled mutual intent

13  test, the acclimatization test or the consideration of

14  the two of them together, this all establishes that

15  the habitual residence is the United States and

16  Mr. Carvajal has not carried his burden to prove by

17  the preponderance of the evidence otherwise.

18          And then as far as the well-settled issue

19  that the petitioner raised, we are not arguing the

20  well-settled defense.  It requires a one-year.  And

21  since we don't have a date of retention, it would be

22  very difficult for us to prove that he'd already been

23  here for a year in order for that to apply.

24          But we are arguing that Mr. Carvajal

25  consented to this move; that he brought his son here

1    and just dropped him off; that he left his clothes and

2    he gave away Ms. Gamba's and Thiago's clothes, which

3    is not something you do if you're expecting them to

4    come back.

5              Now, petitioner need not relinquish his

6    custody rights in order to consent to a permanent

7    move.  Additionally, in their briefs they focused a

8    lot on his intention for what he was going to do for

9    himself.

10             This case is not about where Mr. Carvajal

11   intended himself to live.  This case is about where

12   Thiago was going to live.  And the cases for both

13   habitual residence and consent show that the -- that

14   six months is plenty of time to acclimatize for both

15   the intent and for consent that the -- the aggregation

16   of those facts and once the move is made, that that is

17   enough to establish them.  In particular, I would

18   point the Court to *Feder versus Evans Feder,* which is

19   from the Third Circuit.

20                  THE COURT:  I'm sorry, which case?

21                  MR. SANDERSON:  Feder.

22                  THE COURT:  How do you spell it?

23                  MR. SANDERSON:  F-e-d-e-r v Evans,

24   E-v-a-n-s, Feder, and that's 63 F.3d 217 at page 224.

25   And that's the Third Circuit from 1995.  And there the

1    Third Circuit specifically rejected the argument, this

2    was with shared intent, but that intent can be

3    contingent on whether the married couple in that case

4    stayed together.  And there the fact that the mother

5    believed that she was going to leave a foreign country

6    if her marriage did not improve did not void the

7    couple's settled purpose as far as the child.

8              So whether settled intent or in consent,

9    the place for Thiago to live and have his custody case

10   is here.  This is the appropriate venue,

11   United States, the appropriate venue for him to -- you

12   know, for Mr. Carvajal and Ms. Gamba to contest the

13   custody rights because this was the intended home.

14             And once Thiago came to the

15   United States, he crossed the line where there was

16   settled mutual intent and then there was action.  And

17   the combined effect makes this his home.

18             Given that this is Thiago's home, has

19   been Thiago's home and the facts show that the

20   respondent has been consistent in her testimony

21   whereas, Mr. Carvajal has not provided a credible

22   version of events, simply a variety of versions of

23   events from which the Court can choose from, the

24   respondent requests that the Court determine that the

25   habitual residence for Thiago is the United States.

1           THE COURT:  Thank you.  Any brief

2    rebuttal?  You don't have to rebut.

3           MS. FISHER:  No, Your Honor.

4           THE COURT:  Okay.

5           MS. FISHER:  I think we've said all that

6    we need to say by this point.

7           THE COURT:  Okay.  I think you have too.

8           I'm going to ask you to go through the

9    exhibits with Ms. Sawyer and make sure that they are

10   all here and that you haven't inadvertently left them

11   up here or taken them back to your desks.  So I'm

12   going to ask you before you leave to make sure that

13   she's got all of the exhibits.

14          Thank you.  I know -- Mr. Sanderson, I

15   think you're doing this pro bono too, aren't you?

16          MR. SANDERSON:  A little bit for the

17   immigration case.

18          THE COURT:  Okay.  At any rate, you both

19   have put your heart and souls into it.  It's a very

20   difficult case, it's a very sad case, but I want to

21   thank you both for your good advocacy and all the time

22   that you have put in in presenting your side to the

23   Court.

24          And we will try to make a decision

25   promptly.  But I do feel that I need to write an

1  opinion in this case, and we will get that done as
2  soon as we can.
3               All right.  We're in recess.
4               (Which were all of the proceedings had in
5  the above-captioned cause on the above-captioned
6  date.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1             **<u>REPORTER'S CERTIFICATE PAGE</u>**

2

3         I, Roxann Harkins, Official Court Reporter

4 for the United States District Court for the Middle

5 District of Tennessee, in Nashville, do hereby

6 certify:

7         That I reported on the stenographic machine

8 the proceedings held in open court on March 27, 2018,

9 in the matter of EDISON ALBERTO CARVAJAL VASQUEZ v.

10 PAOLA ANDREA GAMBA ACEVEDO, Case No. 3:18-cv-0137;

11 that said proceedings were reduced to typewritten form

12 by me; and that the foregoing transcript is a true and

13 accurate transcript of said proceedings.

14

15         This is the 12th day of July, 2018.

16

17                 s/ Roxann Harkins_____
                      ROXANN HARKINS, RPR, CRR
18                       Official Court Reporter

19

20

21

22

23

24

25